[Civ. No. 16184.  First Dist., Div. Two.  Mar. 21, 1955.]

ROBERT E. DEKAY, Appellant, v. DEKAY PNEUMATIC TOOLS, INC. (a Corporation), Respondent.

Gordon M. Emanuel for Appellant.

Reginald G. Hearn for Respondent.

KAUFMAN, J.—This is an appeal from a judgment of the Superior Court of the City and County of San Francisco in favor of defendant and cross-complainant DeKay Pneu-

matic Tools, Inc., in an action for declaratory relief brought by Robert E. DeKay, doing business as DeKay Machine Products Company.

On August 24, 1951, appellant Robert DeKay and the DeKay Pneumatic Tools Corporation entered into a manufacturer-distributor contract. Robert DeKay is a licensed mechanical engineer who had for some years prior to the date of the aforesaid contract, operated a small machine shop under the name "DeKay Machine Products Company" wherein he manufactured air tools which he generally sold to wholesalers who distributed them to their customers. Harry Hanover, president of respondent corporation, who first became active in operations relating to the marketing of the appellant's tools in January 1951, testified that between $30,000 and $35,000 had been spent in developing a market for appellant's tools from that time till the commencement of this action. The parties first operated under a letter agreement of February 3, 1951.

The written agreement of August 24, 1951, is incorporated in the complaint for declaratory relief. Appellant, designated in that contract as the First Party, grants to respondent corporation, the Second Party, the exclusive right to purchase, distribute and sell "any and all of First Party's various types of pneumatic tools, accessories, and parts for same."

Other pertinent provisions of the agreement are as follows:

"2. First Party agrees to manufacture Tools and Parts of acceptable and equal or better quality and performance as Tools and Parts previously and currently manufactured, and to further, research and improve Tools and Parts from time to time as required to keep line of Tools competitive and equally acceptable to trade, however, this shall in no way compel or require First Party to make any special or new tool which is not profitable for First Party to produce.

"3. First Party agrees to reserve and incorporate new features, improvements, inventions, mechanical and design styles, pneumatic tools and parts for same, as well as improvements for manufacturing same, to the producting of Tools and Parts covered by this Agreement, and all benefits from such new developments shall be solely for the refinement, workability and trade acceptance of Tools and Parts hereof.

"4. First Party agrees to direct all inquiries and requests for the manufacture of a complete or any portion of pneumatic tools or parts for same over to Second Party along with

First Party's recommendations for accepting or rejecting such inquiry or order in question, however, this shall not include bona fide orders contracted for before August 15, 1951; with it being mutually agreed herewith by both parties hereto that no improvement or feature specially characteristic of Tools and Parts covered by this agreement may be produced for or made available in any manner on such classes of inquiries, unless mutually agreed to in writing. . . .

"9. First Party agrees to accept and manufacture orders for Tools and Parts for Second Party's customers as quickly as possible, or as agreed upon for any order or orders in question, and herewith authorizes Second Party to so advise any such customer that this guarantee of manufacture is herewith extended and assured such customers, through Second Party. . . .

"11. Second Party agrees to maintain a sales department for the promotion and re-sale of said Tools and further agrees to bear all expenses thereof, including promotion, advertising, selling, administrative, traveling expenses and compensation of executives and salesmen of Second Party; and including taxes applicable to operations of Second Party under this Agreement; as well as expenses necessary to establishment of approved agents, dealers, distributors, and wholesalers for Tools and Parts.

"12. In conformity with provisions of the foregoing paragraph, Second Party will maintain a sales personnel to handle the sales and distribution of Tools and Parts, when and where same may be disposed of on a provitable sales basis, and further, Second Party agrees that when proven production capacity of First Party warrants, sales efforts shall be initiated throughout the United States to promote use and sale of Tools and appoint bona fide representatives in such states where profitable sales may be made; and further, Second Party agrees that when added production warrants it and it is possible to make profitable sales in foreign markets, proper export representation will be secured, with all such export sales obligations being conditioned upon export and import regulations and ability to deliver Tools as required and at competitive prices."

Paragraph 16 contains a price list of tools to be used by respondent in placing orders with appellant, and it is therein provided that such prices may be changed from time to time to reflect increase or decrease in cost of material and/or labor upon 15 days' written notice to respondent. Subdivision

E of this paragraph provides: "Second Party agrees to make available up to fifty (50%) per cent of *Second* Party's cost on any order presented for Tools or Parts under this Agreement." (Emphasis ours.)

Paragraph 20 provides that should appellant require funds for the manufacture of tools or other products to be manufactured, he shall first request the loan of such funds from respondent, and if respondent should be unwilling or unable to supply such funds, appellant then agrees to obtain such funds from Harry T. Hanover, before appellant shall attempt to borrow such funds elsewhere. Paragraph 21 provides: "As a condition of this Agreement Second Party [respondent] agrees to purchase from First Party a minimum of one thousand (1,000) Tools per year." Paragraph 22 provides that unless cancelled by failure of Second Party to comply with provisions of foregoing paragraph this Agreement shall remain in force from August 24, 1951 till January 31, 1961.

Appellant, following his refusal to accept an order of respondent for 642 tools dated August 22, 1952, filed this suit for declaratory relief on August 29, 1952, asking that the contract be declared terminated because of respondent's failure to perform its obligation under paragraph 21, to purchase a minimum of 1,000 tools within the year.

The complaint alleged that on or about November 9, 1951, appellant and respondent entered into an oral agreement under which respondent agreed to appellant's sale of 6,000 air drills to the Air Speed Tool Company under appellant's promise to pay respondent $6,000 upon certain conditions, and that this oral agreement was thereafter confirmed in writing. It was further alleged that from the date of execution of the written agreement of August 24, 1951 till August 25, 1952, respondent purchased and resold approximately 329 air drills, and that appellant during this time sold 6,000. Appellant then alleged that paragraph 21 of the agreement requiring respondent to purchase a minimum of 1,000 tools per year is to be interpreted according to the intention of the parties thereto as meaning a duty to purchase and *resell* a minimum of 1,000 tools.

Paragraph VII of the complaint states that respondent contends that it has fulfilled its annual minimum obligation as a consequence of the sale of the 6,000 tools to Air Speed Company, and further, that the purchase, without *resale* of 1,000 drills is sufficient compliance with said provision, so as to permit continuance of the right of respondent to ex-

clusively purchase all pneumatic tools manufactured by appellant.

Respondent in its answer alleged that on November 9, 1951, appellant asked respondent's permission to sell 6,000 tools to Air Speed Company; that all such sales had to be made by or through respondent by virtue of the agreement of August 24, 1951; that "upon the express condition that the aforesaid sale be made pursuant to the terms and provisions of said agreement," respondent "consented to the aforesaid sale and agreed to accept as remuneration therefor the sum of $6,000.00"; that appellant agreed to pay said $6,000 "when the Air Speed Tool Company paid plaintiff (appellant) the entire purchase price for the aforesaid tools"; that the purchase price has been received and that "the entire sum of $6,000.00 is now due and owing" respondent by appellant.

Respondent denied other allegations of the complaint and alleged that it has purchased 1,010 drills from appellant and had received credit pursuant to paragraphs 1, 4, and 21 of the agreement of August 24, 1951, for the sale of 7,010 drills.

Respondent also filed a cross-complaint, alleging that as the agreement of August 24, 1951, was for a 10-year period, cross-complainant conducted its first year operations predicated upon a long range promotion and sales program, and that by reason of certain changes in design of the tools, cross-complainant was prevented from conducting its operations over a considerable period of time. It was again alleged as was alleged in the answer, that on November 9, 1951, appellant asked respondent to permit the direct sale by him of 6,000 air drills to Air Speed Tool Company, and that respondent agreed on condition that such sale be made pursuant to the terms and provisions of the agreement of August 24, 1951, with the exception that the usual remuneration be modified so that respondent would receive $6,000 for the sale; that they agreed that appellant would pay respondent the aforesaid sum when Air Speed Tool Company had paid for the aforesaid order in full; that despite the fact that Air Speed Tool Company has paid appellant in full, appellant has not paid respondent the said $6,000, which sum is now due and owing from appellant to respondent.

Paragraph IX of the cross-complaint alleged that the parties conferred on or about August 7, 1952, regarding the foregoing agreement, respondent taking the position that the sale to Air Speed Tool Company satisfied the require-

ments of Paragraph 21 of the Agreement of August 24, 1951, and appellant taking the position that such sale was exempted therefrom; that appellant agreed to extend the limitation of Paragraph 21 for six months from August 14, 1952, and that appellant later repudiated this agreement; that respondent on August 22, 1952 directed a letter to appellant which read as follows:

"Reference is made to that certain agreement by and between DeKay Machine Products and DeKay Pneumatic Tools, Inc. dated August 24, 1951 and, in particular, provisions 1 and 21 thereof. Further reference is made to that certain sale of 6,000 drills to Air Speed Tool Company on or about November 9, 1951 and your letter directed to us on said day acknowledging a cash credit in our favor in the sum of $6,000.00 incident to said transaction.

"It is our position that full compliance with provision number 21 of the aforesaid agreement has been accomplished by virtue of the terms of provision 1 of said agreement and the aforesaid sale of 6,000 units. It is our understanding that you contend that the aforesaid sale of 6,000 units is not applicable to provision 21 of the aforesaid agreement and, as a consequence thereof, additional units must be purchased by us prior to August 24, 1952 in order to prevent the breach of the aforesaid agreement. In order to protect our rights under the aforesaid contract but, on the other hand, without in any way prejudicing our indicated position and pursuant to provision 21 of the aforesaid agreement, we hereby purchase from you 642 tools of the following descriptions: . . .

"Pursuant to Subdivision (E) of Paragraph 16 of the aforesaid agreement, we hereby agree to forthwith make available 50% of your cost on the aforesaid order. Inasmuch as we possess a cash credit with you in the sum of $5,000.00 which you have acknowledged in your aforesaid letter of November 9, 1951, this sum can be applied in regard to the aforesaid 50% and you are hereby authorized and empowered to forthwith effect such application. The balance of the aforesaid 50%, to-wit, $1,204.25, will be immediately disbursed to you upon receiving your request therefor.

"Kindly advise us when the hereinabove described units have been manufactured in order that appropriate shipping instructions can be given. In the event there are any matters herein described which, in your opinion, require clarification or warrant further discussion, please notify us immediately."

It was alleged that this letter was received by appellant on

August 23, 1952; that he refused to respond thereto, and that on August 29, 1952, his counsel directed a letter to respondent stating that the contract was breached, and on that same date appellant filed this action seeking termination of the contract. Respondent asserted full compliance with paragraph 21 of the Agreement of August 24, 1951, by either the 6,000 unit deal with Air Speed, or the purchase of 642 drills in its letter of August 22, 1952. Cross-complainant asked a declaration of the rights and duties of the parties under the aforesaid agreement with particular reference to Paragraph 21 thereof, and a declaration that the contract is in full force and effect.

After trial an amendment to the cross-complaint was allowed which described certain conduct of appellant subsequent to August 29, 1952. It alleged that appellant in violation of the terms of the agreement, sold tools to persons other than respondent for prices lower than those listed by respondent and in areas where respondent had previously made sales and had made efforts to develop a market, and that appellant had publicly represented that the contract between him and respondent had been terminated. The court was requested to extend the performance obligation of respondent for a period of 60 days from the date upon which judgment should become final.

Answers were filed by appellant to the cross-complaint and the amendment thereto.

After a lengthy trial in which considerable evidence, both oral and documentary was introduced, the trial court made certain findings of fact which are attacked by appellant herein as unsupported by the evidence.

The trial court found that between August 24, 1951, and August 21, 1952, respondent purchased 360 drills from appellant. This finding was not attacked. It then found that the purchase order of respondent dated August 22, 1952, for 640 tools was regular and valid, was duly received by appellant prior to August 24, 1952; that no cash payment accompanied said order nor was respondent requested to make available 50 per cent or any part of appellant's cost on said order; that respondent at that time had a credit of $6,000 which could have been used toward the cost and purchase of the 640 tools; that no payment accompanied any of the previous orders sent by respondent to appellant; that appellant at no time during the year ending August 24, 1952, requested respondent to make available 50 per cent of appellant's costs

on any order, and that respondent was not advised of appellant's costs in manufacturing the 640 tool order. Appellant attacks the statement in this finding that the purchase order was "in all respects regular and valid" as a conclusion of law, and that it may not be used to support the judgment. (*Low* v. *Copeland*, 125 Cal.App. 315 [13 P.2d 522]; *Johndrow* v. *Thomas*, 31 Cal.2d 202 [187 P.2d 681].) However, if the finding that the purchase was regular and valid, is a conclusion of law, still the remainder of the finding is properly a finding of fact. There is evidence in the record, as pointed out by respondent, that no cash deposit accompanied any previous orders of respondent, that respondent was not requested by appellant to make available 50 per cent or any part of appellant's cost on said order, and that a credit of $6,000 existed with appellant in favor of respondent. There was considerable testimony at the trial as to the background of the clause in the contract making 50 per cent of the cost available to appellant. Colonel Hanover testified that in the earlier agreement of February 3, 1951, it was agreed that DeKay should come to respondent first of all if he should be in need of finances, and that if necessary respondent would make available 50 per cent of the cost of the tools which were under order. The phrase "to make available" means to make "accessible or attainable, ready or handy" according to Webster's Dictionary. ■ The fact also that the expression in the contract is "up to 50%" not simply 50 per cent implies that respondent could be called on for funds up to that maximum, but it clearly does not mean a guarantee of a 50 per cent deposit in every case, but only if respondent is called upon to that extent. Since appellant admits that the $6,000 credit existed in favor of respondent as a result of the Air Speed order, the finding that a $6,000 credit existed is not unsupported. The dispute between the parties is only as to how such sum was to be paid to respondent, appellant contending that it was collectible under a special agreement at $2.00 per tool on all future orders, respondent maintaining that it was all due, owing and payable immediately after appellant had collected the sum from Air Speed. Appellant concedes that the credit of $6,000 could have been used to the extent of $2.00 per tool or $1,280 toward the cost of the August 22, 1951, purchase order for 640 tools.

■ Appellant devotes a large portion of his brief to the argument that the trial judge has confused the "First Party"

and "Second Party" to the contract, and has confused and reversed them, because of the fact that in Finding IV the court has referred to "50% of plaintiff's and cross-defendant's costs." It is pointed out that the contract of August 12, 1951, in paragraph 16(B) states: "Second Party [respondent] agrees to make available up to fifty (50%) per cent of *Second* Party's [respondent] cost on any order presented . . ." The paragraph as written in the contract does not appear to make sense. The phrase is sufficiently ambiguous to permit the use of parol testimony to aid in its clarification. From the testimony concerning the financial arrangements between the parties, as well as provision 20 of the contract relating to financing, the trial judge properly concluded that the costs covered by this paragraph of the contracts were the manufacturer's costs.

Appellant admitted that prior orders were not always accompanied by 50 per cent of the purchase price and also that when a check did not accompany an order, he did nothing about notifying respondent, but proceeded to manufacture the tools. It is true, of course, that all these prior orders were much smaller in amount than the order of August 22d. Nevertheless, the trial court could consider this fact as bearing on appellant's construction of the provision of the contract by his conduct under it. Carl Ulrich testified that he placed 90 per cent of the orders for respondent, that all of the orders were not accompanied by a deposit. He further testified that all of the orders did not indicate the name of a purchaser—that is the name of respondent's customer.

Appellant attacks Finding V as a conclusion of law. It states: "That defendant and cross-complainant ordered from plaintiff and cross-defendant a minimum of one thousand (1000) tools pursuant to and in compliance with the terms and provisions and intent of the aforesaid contract between the dates of August 24, 1951 and August 24, 1952." This finding is really a summary of the effect of Findings III and IV, relating to the purchase of 360 drills and the attempted purchase of 640 drills to realize the minimum of 1,000.

Appellant argues that respondent has agreed to *purchase* 1,000 tools per year, and the mere *ordering* cannot constitute performance of this provision. He points to the provision of the contract which states that appellant agrees to manufacture *orders* for tools and parts for second party customers as quickly as possible, or as agreed upon for any order or orders in question. Appellant asserts that he had

a duty to accept respondent's orders for respondent's *customers,* and on this order of August 22d no customer was indicated. Paragraph 1 of the contract states that appellant grants to respondent the exclusive rights to *purchase,* distribute, and sell any and all of appellant's tools. Clearly, then, an order can be valid without respondent designating the person to whom it will resell the tools. Respondent guarantees under paragraph 21 only to *purchase* from appellant, *not to resell,* 1,000 tools per year.

Finding IV shows that an adequate tender of performance was made by respondent to fulfill the requirement of paragraph 21 of the contract, but that appellant rejected the purchase order. We believe the trial court's interpretation is the only reasonable construction of this provision of the contract. If the 1,000 tools had to be manufactured so that they could be completely paid for and accepted by respondent and resold within the year, then it would always be within the power of appellant to prevent performance by respondent by not completing the order within the year.

■ It is certainly well established that an adequate tender of performance by a party to a contract fulfills his duty thereunder, and if his tender is unjustifiably rejected, he cannot then be said to be in default, as here, where appellant complains that there is no evidence that the parties entered into a contract of sale of the 640 tools, when appellant prevented the completion of such contract by refusing to perform. ■ Because of the previous dealings of the parties, respondent not being notified within the year that the order was rejected, was entitled to believe that it had been accepted by appellant. (See Rest., Contracts, § 72 (1) (c).)

Numerous other findings are criticized but we believe that the only finding against which appellant has a justifiable complaint is Finding XVII. That finding reads as follows:

"That on or about July 23, 1951 plaintiff and cross-defendant received an order from Air Speed Tool Company for 6,000 air drills. That on or about the 7th day of November, 1951 plaintiff and cross-defendant requested defendant and cross-complainant to permit the direct sale by plaintiff and cross-defendant to Air Speed Tool Company of said 6,000 air drills; that plaintiff and cross-defendant and the defendant and cross-complainant agreed to the aforesaid sale upon the condition that it be made pursuant to the terms and provisions of the agreement of August 24, 1951 with the

exception, however, that the usual remuneration in regard thereto be modified in order that *defendant and cross-complainant would receive and have a credit from plaintiff and cross-defendant of the sum of Six Thousand Dollars ($6,000) against any and all drills thereafter ordered by defendant and cross-complainant of plaintiff and cross-defendant at the rate of Two Dollars ($2.00) per tool; that said parties agreed that plaintiff and cross-defendant credit defendant and cross-complainant with the aforesaid Six Thousand Dollars ($6,000) on such a basis if, as and when Air Speed Tool Company had paid for the aforesaid order in full; that the order for said 6,000 air drills was completed by plaintiff and cross-defendant about the month of March, 1952; that said Air Speed Tool Company had at the date of the institution of this action and prior to August 24, 1952 paid the plaintiff and cross-defendant in full for the aforesaid order; that defendant and cross-complainant was not given credit for said sum of Six Thousand Dollars ($6,000) on the purchase order of August 22, 1952* which plaintiff and cross-defendant refused to accept, nor has defendant and cross-complainant been paid the sum of Six Thousand Dollars ($6,000)." (Emphasis ours.)

There is no merit in the claim that the finding is unsupported because the order of Air Speed was sent to appellant on July 23, 1951, and the contract of August 24, 1951, excludes all bona fide orders contracted by DeKay before August 15, 1951. The finding recites that the order was *received* on July 23, 1951. The Agreement of August 24, 1951, states that "bona fide orders contracted for" before August 15, 1951, shall be excluded from the agreement. Apparently appellant himself did not believe that the Air Speed order though received, had as yet been *contracted for*, thus making it exempt from the agreement of August 24, 1951, or he would not have made the agreement for a $6,000 credit with respondent which he admits making.

■ Finding XVII definitely finds that an agreement was made between the parties that the $6,000 credit would be paid out to respondent on any and all drills thereafter ordered by respondent from appellant at the rate of $2.00 per tool, that the parties agreed for the credit *on that basis* if, as and when Air Speed had paid in full, and that such payment had been made in full prior to August 24, 1952. The finding then states that respondent was not given credit for the sum of $6,000 on the purchase order of August 22,

1952, nor has respondent been paid the sum of $6,000. This part of the finding clearly conflicts with the prior part of the finding. The agreement for $2.00 credit per tool on future orders is well supported by the testimony of both parties. The trial court found only 1,000 tools were purchased and ordered by respondent in conformity with the contract of August 24, 1951. Clearly, at the rate of $2.00 per tool, only $1,280 credit could be used against the order of August 22, 1951. If the 360 tools were purchased subject to this credit also, then another $720 credit would have accrued to respondent, or a total of $2,000. Since the trial court has found that 1,000 tools had been ordered and purchased up to August 24, 1951, the entire sum of $6,000 was not payable under the agreement of the parties until a total of 3,000 tools had been purchased.

Since the judgment has decreed the contract of August 24, 1951, to be still in full force and effect, this finding does not support the judgment for $6,000 in favor of respondent with interest from August 29, 1952, the date when respondent was notified of the rejection of the order. Such a judgment is consistent only with a finding that the contract has been terminated, or with a finding that the credit arrangement for $2.00 per tool was never agreed upon, but that the sum was payable in full at all times after it was paid to appellant by Air Speed. The evidence pointed out by respondent could support a finding that the $6,000 was due when paid by Air Speed, even though the testimony and documentary evidence is certainly abundant to support a finding that the commission was to be absorbed at $2.00 per tool if the contract was not terminated. The trial court, however, must find one way or the other. The difficulty with Finding XVII is that it appears to find both ways on this issue. If it finds that it is true that such a credit agreement was made, then it cannot give judgment for the $6,000, since 3,000 tools have not yet been ordered. If it finds that the commission was to be paid when paid by Air Speed, and that the credit agreement was never consummated, then the $6,000 judgment may stand.

Appellant contends that the trial court made no finding of fact or conclusions of law on the complaint and answer at all. The main issue in the case was whether respondent had fulfilled its obligation under paragraph 21 of the contract to purchase a minimum of 1,000 tools. If it had not, then the contract was terminated by virtue of its own terms.

The trial court found that this minimum had been met, and that the contract was in full force and effect on the date when appellant attempted a termination. The findings therefore adequately cover the issues tendered by the complaint and answer.

It is clear that there is a material conflict in Finding XVII, the determination of which is essential to the rendition of a correct judgment. Accordingly the judgment is reversed with directions to the trial court to amend Finding XVII so that it will be clear as to whether the parties reached an agreement to pay the $6,000 credit to respondent immediately it was received by appellant or to pay respondent on a $2.00 per tool credit basis. When said finding has been so amended judgment shall be entered to conform thereto.

In all other respects the judgment of the trial court finds support in the findings and evidence and is affirmed.

That portion of the judgment awarding respondent $6,000 is reversed with directions to trial court as specified.

Nourse, P. J., and Dooling, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 18, 1955. Schauer, J., was of the opinion that the petition should be granted.