Filed 1/2/19

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CALTEC AG, | F074334 |
| Plaintiff and Appellant, | (Super. Ct. No. 2016497) |
| v. | |
| DEPARTMENT OF PESTICIDE REGULATION et al., | **OPINION** |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Stanislaus County. Timothy W. Salter, Judge.

King Williams and Jennifer Hartman King for Plaintiff and Appellant.

Xavier Becerra, Attorney General, Robert W. Byrne, Assistant Attorney General, Annadel A. Almendras, Barbara C. Spiegel and Bryant B. Cannon, Deputy Attorneys General, for Defendants and Respondents.

-ooOoo-

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II., III., V.E., and V.F.

**SEE CONCURRING OPINION**

Appellant Caltec Ag, Inc. (Caltec) challenges a final administrative decision of the California Department of Pesticide Regulation (Department or DPR) that three of Caltec's products were pesticides. Pursuant to Food and Agricultural Code sections 12993 and 12999.4,[1] the Department imposed fines totaling $784,000, finding that the products should have been registered as pesticides before being sold in California.

California's statutory scheme for the regulation of pesticides defines "pesticide" to include (1) any "spray adjuvant," (2) any mixture of substances intended to be used for regulating plant growth, and (3) any substance used to prevent, destroy, repel or mitigate any pest. (§ 12753.) Here, the Department determined products named "Greenfeed 27-0-0" and "Terra Treat" were spray adjuvants and a product named "Kelpak," a liquid extract from edible seaweed, was intended to be used as a plant growth regulator. Prior to the Department's determinations, the California Department of Food and Agriculture (DeptAg) had issued certificates registering the products as specific types of "fertilizing materials." (§ 14533.) Greenfeed 27-0-0 was registered as a "commercial fertilizer" (§ 14522), Terra Treat as an "auxiliary soil and plant substance" (§ 14513), and Kelpak as an "organic input material" (§ 14550.5). Thus, Caltec contends the products were fertilizers and not pesticides.

As to Greenfeed 27-0-0, we conclude substantial evidence supports the finding that this commercial fertilizer is also a spray adjuvant. A Caltec document states Greenfeed 27-0-0 is compatible with pesticides other than sulfur, has excellent sticking and spreading qualities, and can be used as a carrier for pesticides. The document supports a finding that Greenfeed 27-0-0 is a spreading agent intended to be used with another pesticide as an aid to the application of the other pesticide. Consequently, Greenfeed 27-0-0 satisfies the definition of a spray adjuvant. (§ 12758.)

---

[1]     Subsequent unlabeled statutory references are to the Food and Agricultural Code.

Substantial evidence also supports the findings that Terra Treat is a spray adjuvant—specifically, a wetting agent that aids the application of pesticides. Terra Treat's label described it as a soil surfactant/penetrant designed to uniformly distribute fertilizer, pesticides and water throughout the root zone. Also, a May 2011 technical information sheet states Terra Treat significantly increases the effectiveness of certain insecticides and herbicides. Based on these and other documents in the record, the Department's finding that Terra Treat is a spray adjuvant and, therefore, a pesticide under section 12753 is supported by substantial evidence.

As to Kelpak, substantial evidence supports the findings that (1) Kelpak is a liquid auxin concentrate, (2) naturally occurring auxins in concentrated form are plant growth regulators, and (3) Caltec sold Kelpak with the intent that it be used as a plant growth regulator. Accordingly, the Department did not commit factual error in determining Kelpak is a plant growth regulator and, therefore, a pesticide under section 12753.

As to the questions of statutory construction involving the relationship between the chapter of the Food and Agricultural Code governing pesticides and the chapter governing fertilizers, we conclude the DeptAg's prior registration of Terra Treat as an "auxiliary soil and plant substance" (§ 14513) and Kelpak as an "organic input material" (§ 14550.5) does not preclude the Department from determining those products were pesticides.

Caltec also has raised claims of procedural and evidentiary error. We conclude any procedural error was not prejudicial and Caltec has failed to demonstrate the hearing officer's treatment of the evidence violated an applicable rule of law.

We therefore affirm the judgment.

## FACTS AND PROCEEDINGS

Caltec markets and sells a variety of agricultural plant nutrients, crop protectors and chemicals. In December 2012, the Department received an email from a licensed pest control advisor stating that a product named Microlife was being actively promoted

and sold as a nematicide by Caltec even though Microlife was not registered as a pesticide. The email attached copies of labels used by the companies selling the product.[2]

On the morning of May 30, 2013, the Department issued a "NOTICE OF INSPECTION" to Caltec for its office in Modesto. The inspector was Saiful Chowdhury, who works as an environmental scientist in the Department's product compliance branch. Chowdhury spoke with Caltec's office manager who informed him no products were located at the corporate office in Modesto and customers took possession of the materials they ordered at Caltec's warehouse in Fresno. The office manager provided Chowdhury with copies of labels for the products sold and a guide manual for Kelpak. After reviewing the documents, Chowdhury issued "PESTICIDE STATUTES VIOLATION NOTICE[S]" relating to four products that were not registered as pesticides with the Department. The products were Microlife, Greenfeed 27-0-0, Terra Treat, and Kelpak. The notices (1) stated the Department's opinion that the products were pesticides that required registration, (2) advised Caltec it was illegal to sell unregistered pesticides in California, and (3) noted Caltec had refused to provide sales invoices for the products.

On June 17, 2013, counsel for Caltec responded to the violation notices by sending the Department a letter stating (1) Greenfeed was a fertilizer, (2) Terra Treat was a soil penetrant used in irrigation to prevent puddling and to promote lateral movement of water in soil, and (3) "Kelpak is a natural plant growth regulator made out of sea weed and is used to increase the set and quality of fruits and vegetables." The letter stated Caltec's position that the products were not pesticides and asserted the products were not intended to control or destroy pests. The letter requested the withdrawal of the violation notices.

---

[2] On appeal, Caltec has not challenged the determination that Microlife was a pesticide.

4.

The Department did not withdraw the violation notices and continued its attempts to obtain sales information for the products. Meanwhile, in November 2013, Chowdhury completed an investigation summary using the Department's preprinted form. The investigation summary concluded Microlife, Greenfeed, Terra Treat and Kelpak were pesticides. Exhibits to the investigation summary included (1) documents obtained from Caltec's Web site, (2) a September 13, 2012, press release from the United States Environmental Protection Agency (EPA), (3) a Kelpak label received from Caltec's owner, (4) documents from the Web site of Kelpak's manufacturer, and (5) the June 17, 2013, letter from Caltec's counsel.

In December 2013, the Department again requested sales information for the products by sending Caltec's owner a letter. Counsel for Caltec responded in a letter dated January 13, 2014, which asserted the products were fertilizers, not pesticides, and refused to provide the sales data.

On May 29, 2014, after failing to obtain sales information through less formal means, the Department issued an administrative subpoena duces tecum to Caltec for all invoices, bills of lading, receipts and other documents evidencing the sale of Microlife, Greenfeed, Terra Treat and Kelpak in California from June 1, 2010, to June 1, 2014. In October 2014, Caltec finally produced its sales invoices.

*Notice of Violations*

On January 29, 2015, the Department issued a notice of proposed action to levy civil penalties under section 12999.4 (Notice of Proposed Action). The Department alleged Caltec violated section 12993 by selling Microlife (17 sales), Greenfeed (133 sales), Terra Treat (7 sales), and Kelpak (282 sales) in California when those products were not registered as pesticides. The Department proposed levying a civil penalty totaling $789,000. The Notice of Proposed Action stated Caltec could contest the proposed action by requesting a hearing no later than 20 days after its receipt of the notice. A form for requesting a hearing was attached.

5.

*Administrative Proceedings and Decision*

On February 19, 2015, Caltec requested a hearing. The next day—a Friday—the Department sent Caltec a notice of hearing stating the hearing would begin on Thursday, March 12, 2015, and proposed ongoing hearing dates of the next three business days. Caltec's appellate briefing represents Caltec received the notice of hearing on February 25, 2015, a Wednesday.[3] Additional details about the procedural steps in the administrative process leading to the Department's decision are provided in the chronology of events set forth in part II.A.3., *post*.

On July 14, 2015, after various procedural steps were completed, including the hearing itself, the hearing officer submitted a proposed decision to the Department. The proposed decision set forth the statutory definitions of pesticide (§ 12753), spray adjuvant (§ 12758), pest (§ 12754.5), and regulating plant growth (§ 12756) and the regulatory definition of the phrase "intended to be used" (Cal. Code Regs., tit. 3, § 6145 (Regulation 6145)). The proposed decision stated (1) Microlife was intended to suppress nematodes,[4] (2) Greenfeed was a spray adjuvant, (3) Terra Treat was a spray adjuvant, and (4) Kelpak was a liquid auxin concentrate sold as a plant growth regulator. As a result, the proposed decision concluded the four products were pesticides and recommended a penalty totaling $939,000 for 438 sales of unregistered pesticides. The unregistered sales had generated proceeds of approximately $5,168,000 and, therefore, the proposed fine equaled about 18.2 percent of the sales revenue.

On July 17, 2015, the director of the Department, Brian Leahy (Director), issued a decision and order adopting the findings in the proposed decision and amending the per

---

[3]     The Department contends the notice was delivered to the offices of Caltec's attorney by certified mail on February 23, 2015, at 3:59 p.m. and cites information printed from the United States Postal Service's tracking Web site.

[4]     Microlife's label described it as a "Nematode Suppressant."

6.

violation penalties, which reduced the total fine to $784,000. The proposed decision as modified and adopted by the Director is referred to as the "Decision" in this opinion.

*Administrative Mandamus Proceedings*

In August 2015, Caltec filed a petition for writ of administrative mandamus pursuant to Food and Agricultural Code section 12999.4 and Code of Civil Procedure section 1094.5. In December 2015, Caltec filed an amended petition.

After briefing, a hearing on the writ petition, and a hearing on objections to the superior court's statement of decision, the court denied the petition. In September 2016, the superior court signed and filed an amended statement of decision and amended judgment implementing its decision to deny Caltec's petition for writ of administrative mandamus. Caltec filed a timely notice of appeal challenging the final judgment.

## DISCUSSION

### I.      GENERAL PRINCIPLES

#### A.      <u>Standard of Review</u>

Decisions of the Director are subject to judicial review pursuant to section 1094.5 of the Code of Civil Procedure, which governs administrative mandamus. (§ 12999.4, subd. (c).) When conducting such a review, the court's inquiry "shall extend to the questions [1] whether the respondent has proceeded without, or in excess of, jurisdiction; [2] whether there was a fair trial; and [3] whether there was any prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5, subd. (b).) An abuse of discretion can occur three different ways: (1) "the [Director] has not proceeded in the manner required by law," (2) the "decision is not supported by the findings," or (3) "the findings are not supported by the evidence." (*Ibid.*)

Generally, one of two different statutory standards govern challenges to the sufficiency of the evidence supporting a final administrative decision. The appropriate standard is determined by whether the superior court is authorized to exercise its

7.

independent judgment on the evidence. (Code Civ. Proc., § 1094.5, subd. (c).) Here, neither party contends the superior court was authorized to exercise its independent judgment. Therefore, the reviewing court must determine whether the findings are "supported by substantial evidence in light of the whole record." (*Ibid*.)

B.      Regulation of Pesticides

Pesticides are regulated by both the federal government and the State of California. In 1947, Congress enacted the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA; 7 U.S.C. § 136 et seq.) to centralize registration and promote the accurate labeling of pesticides. (Joiner, *Bates v. Dow Agrosciences LLC: The Beginning of the End of the "Era of Irresponsibility"* (2006) 33 So.U. L.Rev. 361, 363–364.) In 1972 Congress transformed FIFRA from a labeling act to a comprehensive regulatory statute. (Joiner, *supra*, at p. 364.) The changes included granting the EPA the responsibility of enforcing FIFRA and the authority to determine whether a pesticide could be registered and sold in the United States. (Joiner, *supra*, at pp. 364–365.)

FIFRA expressly allows states to "regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by [FIFRA]." (7 U.S.C. § 136v(a).) To promote uniformity, states shall not impose labeling or packaging requirements different from those required by FIFRA. (7 U.S.C. § 136v(b).) In accordance with the provisions of FIFRA, the California Legislature has enacted a statutory scheme for the regulation of pesticides.

1.      *Registration in California*

A pesticide cannot be sold in California unless the product's label is registered with the Department.[5] (§ 12993.)

---

[5]     The Department (i.e., DPR) is one of six agencies operating under the California Environmental Protection Agency. (§ 11451.) The California Environmental Protection Agency and the DPR were created in 1991 pursuant to the Governor's Reorganization

The purposes of the pesticide registration requirements are to (1) provide for the proper, safe, and efficient use of pesticides essential for (a) production of food and fiber and (b) protection of the public health and safety; (2) protect the environment by regulating or ensuring proper stewardship of pesticides; (3) assure safe working conditions for agricultural and pest control workers; (4) assure users that pesticides are properly labeled and are appropriate for the use designated by the label; and (5) assure users that information on pesticidal use of the product disseminated by state or local government is consistent with the uses for which the product is registered.  (§ 11501.)

Before a pesticide can be registered in California, it must first be registered by the EPA.  (*Pesticide Action Network North America v. Department of Pesticide Regulation* (2017) 16 Cal.App.5th 224, 232–233.)  Compliance with FIFRA and its registration requirement has been described as "extremely expensive and time consuming."  (Hansen, *Agricultural Nonpoint Source Pollution: The Need for an American Farm Policy Based on an Integrated Systems Approach Recoupled to Ecological Stewardship* (1994) 15 Hamline J. Pub. L & Pol'y 303, 320.)[6]  After the EPA has registered a pesticide, it is eligible for the Department's review.  (*Pesticide Action Network*, *supra*, at p. 233.)  The Department is charged with thoroughly evaluating the pesticide to ensure that, when used

_____

Plan.  (See *Fernandez v. California Dept. of Pesticide Regulation* (2008) 164 Cal.App.4th 1214, 1222.)  The DeptAg previously administered California's pesticide regulatory program, but the Governor's Reorganization Plan transferred the responsibility for that program to the DPR.  (*Ibid*.; § 11454.)  The DPR and the DeptAg are separate agencies and do not share a common parent organization, a fact that has some relevance in determining the effect on the DPR of the DeptAg's decision to register a product as a fertilizing material.

[6]     "To register a pesticide, [EPA] requires the registration applicant to submit a large number of studies concerning the chemistry and toxicology of the pesticide, the potential risks it may pose to worker safety and public health, the effects it may have on the environment, fish, wildlife and non-target insects, and other studies that bear on the pesticides safety and effectiveness."  (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 124, as amended Jun. 11, 1996, p. 2.)

in conformance with its labeling, it is effective and will not harm human health or the environment.  (*Ibid.*; § 12824.)

To summarize, the federal pesticide regulatory program and the state program require sequential registration of a product the Department has decided is a "pesticide." This registration process is slow and expensive.

### 2.     *Statutory Definitions*

California's definition of "pesticide" includes (1) any "spray adjuvant" and (2) any substance or mixture "intended to be used for [(a)] defoliating plants, [(b)] regulating plant growth, or [(c)] for preventing, destroying, repelling, or mitigating any pest … which may infest or be detrimental to vegetation, man, animals, or households, or be present in any agricultural or nonagricultural environment whatsoever."  (§ 12753.)  In comparison, FIFRA defines "pesticide" to mean "(1) any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any pest, (2) any substance or mixture of substances intended for use as a plant regulator, defoliant, or desiccant, and (3) any nitrogen stabilizer," subject to certain exceptions that are not relevant here.  (7 U.S.C. § 136(u).)  Thus, the federal definition does not include "spray adjuvants" and California's definition does not include nitrogen stabilizers.

For purposes of this appeal, two significant components of the definition of "pesticide" are (1) the term "spray adjuvant" and (2) the phrase "regulating plant growth."  "'Spray adjuvant' means any wetting agent, spreading agent, deposit builder, adhesive, emulsifying agent, deflocculating agent, water modifier, or similar agent, with or without toxic properties of its own, which is intended to be used with another pesticide as an aid to the application or effect of the other pesticide, and sold in a package that is separate from that of the pesticide other than a spray adjuvant with which it is to be used."  (§ 12758.)

"'Regulating plant growth' [generally] means the use of any substance or mixture of substances intended, through physiological action, for accelerating or retarding the rate of growth or rate of maturation, or for otherwise altering the behavior of plants or the produce thereof." (§ 12756.) The statute also sets forth two exceptions to this general rule. First, the phrase "shall not include the use of substances to the extent that they are intended as plant nutrients, trace elements, nutritional chemicals, plant inoculants, and soil amendments." (*Ibid.*) Second, "'regulating plant growth' shall not be required to include at all the use of any of such of those nutriment mixtures or soil amendments as [1] are commonly known as vitamin-hormone horticultural products, intended for improvement, maintenance, survival, health, and propagation of plants and [2] are not for pest destruction and [3] are nontoxic, nonpoisonous in the undiluted packaged concentration."

The phrase "intended to be used" is not defined by the Food and Agricultural Code, but is defined in the regulations implementing the pesticide regulatory program. (Regulation 6145.) The definition can be satisfied in three different ways:

> "(a) A person who distributes or sells the substance claims, states, or implies, by labeling or otherwise, that: [¶] (1) the substance, either by itself or in combination with any other substance, can or should be used as a pesticide; or [¶] (2) the substance consists of or contains an active ingredient and can be used to manufacture a pesticide; or
>
> "(b) A person who distributes or sells the substance has actual or constructive knowledge that the substance will be used, or is intended by the user to be used, as a pesticide; or
>
> "(c) The substance consists of or contains one or more active ingredients and has no significant commercially valuable use as distributed or sold other than: [¶] (1) use as a pesticide, by itself or in combination with any other substance; or [¶] (2) use in the manufacture of a pesticide." (Regulation 6145.)

The first two definitions are based on intent. The third definition is based on the ingredients and does not involve the intent of the seller or the intent to the user.

### 3.    *Interpreting Regulation 6145*

The parties disagree as to the proper interpretation of subdivision (c) of Regulation 6145.  Caltec contends the phrase "has no significant commercially valuable use" refers to the "substance" and not to "one or more active ingredients."  (Regulation 6145, subd. (c).)  On appeal, the Department contends the third definition of "intended to be used" (Regulation 6145, subd. (c)) allows for the intended use of a substance to be demonstrated by the presence of "active ingredients" and, so long as an active ingredient's only significant commercially valuable use is as a pesticide, the actions or mental state of the distributor or seller are irrelevant.[7]

We conclude the words and grammar of subdivision (c) of Regulation 6145 are not ambiguous on the question of whether the phrase "has no significant commercially valuable use" refers to the "substance" or, alternatively, refers to "one or more active ingredients."  The phrase refers to the "substance," that is the product being sold or distributed.  Accordingly, to establish a product is a pesticide under the ingredients-based definition in subdivision (c) of Regulation 6145, the Department must prove the "substance [1] consists of or contains one or more active ingredients and [2] has no significant commercially valuable use as distributed or sold other than" use as a pesticide.  The use of the conjunction "and" clearly establishes that the substance must satisfy two elements.  (*In re C.H.* (2011) 53 Cal.4th 94, 101 [ordinary and usual usage of statutory

---

**7**    Neither the Director nor the hearing officer expressly interpreted subdivision (c) of Regulation 6145 to mean the phrase "has no significant commercially valuable use" refers to "one or more active ingredients" and not to the "substance."  Generally, when an agency's interpretation is carefully considered by senior agency officials, it is entitled to correspondingly greater weight.  (*Allende v. Department of California Highway Patrol* (2011) 201 Cal.App.4th 1006, 1018.)  In contrast, an argument advanced by the agency's litigating counsel is not regarded as an agency interpretation and, thus, is given less weight.  (*Ames v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (2d Cir. 1977) 567 F.2d 1174, 1177, fn. 3; see 2B Singer & Singer, Statutes and Statutory Construction (7th ed. 2012) § 49:4, p. 85 ["arguments of an agency's counsel do not have the probative force of an official agency interpretation"].)

term "and" is as a conjunctive, meaning an additional thing, also, or plus].)  If the reference to the absence of commercial value had been intended to modify the phrase "one or more active ingredients," the words "and has" would have been replaced with "that have" or "having."  (See *Surfrider Foundation v. California Regional Water Quality Control Bd.* (2012) 211 Cal.App.4th 557, 576 [courts must interpret statutes consistent with the meaning derived from its grammatical structure].)

The interpretation of subdivision (c) of Regulation 6145 advocated by counsel for the Department on appeal cannot be adopted by this court because it is contrary to the unambiguous language of the regulation.  Thus, that interpretation, in effect, rewrites the regulation.  To be valid, such a rewriting (i.e., amendment) of the regulation must be adopted in substantial compliance with the procedures of the Administrative Procedures Act (Gov. Code, § 11340 et seq.).  (See *Patterson Flying Service v. Department of Pesticide Regulation* (2008) 161 Cal.App.4th 411, 429 ["underground regulation" is not adopted in compliance with Administrative Procedures Act and, thus, is invalid].)

Based on the foregoing interpretation, the critical facet of the regulatory definition of "intended to be used" is set forth in subdivision (a)(1) of Regulation 6145.  That definition is satisfied when the company selling or distributing the substance claims, states, or implies that the substance can or should be used as a pesticide.  Under this definition, a company must be careful in marketing a product because claims about its capabilities, even if inaccurate, could cause that product to be subject to the pesticide regulatory program.

C.    Auxins and Cytokinins

As part of his investigation, Chowdhury printed a page from a Web site at http://www.kelpak.com/activity/how_it_works.html on June 10, 2013.  The page describes auxins and cytokinins as follows:

13.

"Auxins are natural plant hormones produced in a plant's shoot tips and translocate downwards. One of its effects is to signal a plant to increase its root growth.

"Cytokinins are natural plant hormones produced in root tips and translocated upwards. One of its effects is to signal a plant to produce more and larger foliage."

The subject of plant growth regulators is addressed in part II of chapter 15 of Anderson & Simon, Defending Pesticides in Litigation (2018) (*Defending Pesticides*). Section 15:34 of *Defending Pesticides* states that "[i]n 1934, auxins were found to enhance root formation in cuttings." Section 15:35 of *Defending Pesticides* states: "Auxins are compounds that induce elongation in shoot cells. Some occur naturally, whereas others are manufactured. Auxin precursors are materials that are metabolized to auxins in plants." It also states the mechanism of action is not completely understood, but with the addition of auxin the individual cells become larger by a loosening of the cell wall, which is followed by increased water uptake and expansion of the cell wall. Auxins include the herbicide 2,4-D.[8]

Section 15:37 of *Defending Pesticides* describes cytokinins as "naturally occurring or manufactured compounds that induce cell division in plants." It also states cytokinins were discovered in 1955 and have two notable effects in plants—that is, "the induction of cell division and the regulation of differentiation in removed plant parts." Section 15:34 of *Defending Pesticides* states that six classes of plant growth regulators are recognized by the American Society for Horticultural Science, including auxins, gibberellins, cytokinins and ethylene generators.

---

[8] Section 14031 uses "2,4-D" to mean "any form of 2,4-dichlorophenoxyacetic acid." In 1949, the Legislature made 2,4-D a restricted material. (*People ex rel. Deukmejian v. County of Mendocino* (1984) 36 Cal.3d 476, 481; see Cal. Code Regs., tit. 3, § 6400, subd. (e) [2,4-D included in pesticides designated restricted materials].)

II.     ADMINSTRATIVE ADJUDICATION BILL OF RIGHTS[*]

    A.      Background

        *1.      Statutory Provision*

The Administrative Adjudication Bill of Rights (Gov. Code, §§ 11425.10–11425.60) was enacted in 1995 (Stats. 1995, ch. 938, § 21) as part of a major revision of California's Administrative Procedure Act.  (See *California Youth Authority v. State Personnel Bd.* (2002) 104 Cal.App.4th 575, 589.)  Here, Caltec contends the Department violated obligations set forth in Government Code section 11425.10, subdivision (a)(2).  That provision states:

> "(a) The governing procedure by which an agency conducts an adjudicative proceeding is subject to all of the following requirements:  [¶] … [¶]  (2) The agency shall make available to the person to which the agency action is directed a copy of the governing procedure, including a statement whether Chapter 5 (commencing with Section 11500) is applicable to the proceeding."  (Gov. Code, § 11425.10.)

Caltec contends this provision imposes a mandatory obligation on the Department and the obligation has no exceptions.  We note that the relevant text does not contain a timing element that identifies *when* the agency must make the copy available and does not define the term "available."[9]  The Law Revision Commission Comment to Government Code section 11425.10 addresses availability by stating:

> "Subdivision (a)(2) requires only that the agency 'make available' a copy of the applicable hearing procedure.  This requirement is subject to a rule of reasonableness in the circumstances and does not necessarily require the agency routinely to provide a copy to a person each time agency action is directed to the person.  The requirement may be satisfied, for example, by the agency's offer to provide a copy on request."  (Cal. Law Revision Com.

---

[*]     See footnote, *ante,* page 1.

[9]     In a case involving contractual language, the First District stated:  "The phrase 'to make available' means to make 'accessible or attainable, ready or handy' according to Webster's Dictionary."  (*De Kay v. De Kay Pneumatic Tools* (1955) 131 Cal.App.2d 625, 633.)

com. 32D, pt. 1 West's Ann. Gov. Code (2018 ed.) foll. § 11425.10, p. 390.)

### 2. Caltec's Contentions

Caltec asserts that the Notice of Proposed Action and the subsequent notice of hearing did not provide any statement or explanation of the nature or scope of the administrative proceedings or the processes and procedures that governed them. Caltec further asserts that "these procedures were explained in DPR's administrative proceeding procedures handout, which [the Department] maliciously and prejudicially failed to timely furnish to Caltec (including when they were explicitly requested)."

### 3. Chronology of Events

*January 29, 2015*: The Department mailed Caltec the Notice of Proposed Action alleging Caltec had violated section 12993 by selling pesticides in California without first registering them. The notice stated that if Caltec wished to contest the proposed action it was required to request a hearing within 20 days of receiving the notice.

*February 19, 2015*: Caltec requested a hearing.

*February 20, 2015*: The Department sent Caltec a notice stating the hearing would begin on Thursday, March 12, 2015, and proposed ongoing hearing dates of the next three business days. The notice of hearing stated the Department would provide Caltec with a copy of the evidentiary documents and list of proposed witnesses by email and an overnight courier no later than March 2, 2015. The notice did not mention the governing procedures that would be followed at the hearing or the existence of a brochure describing those procedures.

*February 27, 2015*: The Department emailed Caltec a copy of a request for judicial notice.[10] The email listed nine witnesses and stated Caltec should receive a hard

---

[10] The reference to "judicial" notice is a misnomer because the proceeding is not conducted before a judge. Government Code section 11425.50, subdivision (c), which is part of the Administrative Adjudication Bill of Rights provides that the facts stated in the written decision must be based exclusively "on the evidence of record in the proceeding

and electronic copy of the hearing exhibits on Monday, March 2, 2015.  The email also stated the hearing exhibits "are also available for your review in our office."

*March 6, 2015*:  Caltec sent a letter to the Director requesting the hearing be continued for at least two months.  The letter also stated:  "Please provide information relevant to DPR's hearing processes and procedures when responding to this request, so Caltec may properly prepare for the continued hearing."  Later that Friday, counsel representing the Department sent counsel for Caltec an email stating the "request for a continuation of this matter is denied.  The hearing will proceed."  The email did not respond to the request for information about applicable procedures.

*March 10, 2015*:  The hearing officer sent an email to counsel for Caltec and the Department stating Caltec's request for a continuance was denied "with the caveat that March 12, 2015 will be a prehearing conference where we will sort through evidentiary and procedural issues related to the hearing."

*March 11, 2015*:  Counsel representing the Department in the administrative proceeding sent an email to counsel for Caltec stating:  "Please see the attached."  The email's subject line described the attachment as follows: "Handout—Preparing for an Administrative Hearing."  This email and attachment responded to Caltec's March 6, 2015, request for information about the procedures applicable to the hearing.

*March 12, 2015*:  The hearing officer met with counsel.  The Department characterizes the meeting as a prehearing conference.  In contrast, Caltec describes it as the commencement of the administrative hearing.  At the meeting, counsel for the Department described the 13 exhibits she intended to submit.  Later during the meeting, counsel for Caltec stated that she had "just received the voluminous document production from DPR a mere seven business days ago."

and on matters *officially noticed* in the proceeding."  (Italics added.)  Thus, this provision suggests such a request in an administrative proceeding should be called a request for *official* notice, rather than *judicial* notice.

17.

*April 1, 2015*:  Administrative hearing.

*April 3, 2015*:  Last day of administrative hearing.

In July 2015, after receiving the posthearing briefing and other submissions, the hearing officer issued his proposed decision.  A few days later, the Director entered his decision and order.

To summarize, Caltec requested a hearing on February 19, 2015, and the notice of hearing sent the next day did not inform Caltec about the governing procedures.  After Caltec requested such information on March 6, 2015, the Department emailed a copy of its brochure on March 11, 2015, the day before counsel first met with the hearing officer.  The administrative hearing commenced on April 1, 2015.

B.    Analysis

1.    *Violation Assumed*

Subdivision (a) of Government Code section 11425.10 sets forth requirements for an "adjudicative proceeding" conducted by an agency.  At a minimum, the *adjudicative* nature of the Department's administrative proceeding was established when Caltec requested a hearing.  The Department has offered no explanation for why its brochure titled "Preparing for an Administrative Hearing" was not included with the notice of hearing or, alternatively, why the notice of hearing did not inform Caltec a copy of the brochure was available on request.  The sentence immediately following the brochure's title states:  "You have requested an opportunity to be heard at an administrative hearing regarding alleged violations pertaining to unlawful pesticide sales."  In light of how the brochure is drafted, a common sense approach (i.e., one reasonable under the circumstances) would be to include the brochure with the notice of hearing or at least state a brochure about procedures exists and is available on request.

In this appeal, we assume, without deciding, the Department violated Government Code section 11425.10, subdivision (a)(2) and the violation constituted an abuse of

18.

discretion for purposes of Code of Civil Procedure section 1094.5, subdivision (b). Specifically, we assume a copy of the brochure should have been included with the February 20, 2015, notice of hearing or, alternatively, the notice should have informed Caltec of the brochure's existence and that copy would be provided upon request.

### 2. *Prejudice*

Next, we consider whether the assumed abuse of discretion was "prejudicial" within the meaning of subdivision (b) of section 1094.5 of the Code of Civil Procedure. Caltec has addressed the question of prejudice by arguing how the delay in its receipt of the brochure affected its ability to prepare a defense.

Caltec contends it was unable to utilize many of the prehearing procedural entitlements described in the brochure, including (1) "calling DPR to make an appointment to view DPR's evidence" and (2) "requesting to schedule a pre-hearing conference with DPR before a hearing was set to commence." Caltec argues that because of the belated transmission of the brochure, "Caltec was prevented from adequately preparing for the administrative proceedings before DPR, as it was completely unaware of the DPR-specific processes, procedures and rules that applied before, during and after the administrative hearing."

First, we consider Caltec's claim that it was prejudiced because it was prevented from calling the Department and making an appointment to review the evidence. Counsel for Caltec has represented to this court that Caltec received the notice of hearing on February 25, 2015. If the brochure had been included with the notice of hearing, the earliest Caltec could have scheduled an appointment to review documents would have been Thursday, February 26, 2015. Based on the statement of counsel for Caltec, it appears she received the Department's proposed exhibits on Tuesday, March 3, 2015. Thus, the failure to include the brochure with the notice of hearing might have delayed Caltec's review of the documents by up to five days. We conclude the five-day delay

19.

was not prejudicial to Caltec in the presentation of its defense, which occurred on April 1, 2015. The amount of time that passed between Caltec's March 3, 2015, receipt of the Department's exhibits and the presentation of its defense before the hearing officer was 29 days and Caltec has not shown how an additional five days would have altered its presentation of evidence or arguments. Therefore, we conclude Caltec was not prejudiced by the delay in being told it could call the Department and making an appointment to see the evidence.

Second, we consider Caltec's prejudice claim based on its inability to utilize the prehearing procedure of "requesting to schedule a pre-hearing conference with DPR before a hearing was set to commence." We reject this argument because Caltec has not shown how such a meeting, which would have been held outside the presence of the hearing officer, would have affected the proceedings. Moreover, the hearing officer's decision to conduct a conference with counsel on March 12, 2015, and continue the matter until April 1, 2015, provided Caltec with an effective substitute for any prehearing meeting to confer outside the presence of the hearing officer and prevented any prejudice resulting from the delay in informing Caltec of its ability to request such a conference.

In summary, we conclude Caltec has not demonstrated it was prejudiced by the delay (February 25, 2015, until March 11, 2015) in its actual receipt of a copy of the brochure describing the governing procedures. Accordingly, the superior court properly refused to grant the writ of administrative mandamus based on a violation of Government Code section 11425.10, subdivision (a)(2).

III.    GREENFEED[*]

    A.    Background

        1.    *Administrative Decision*

The Decision contains a factual background section that includes a paragraph

addressing Greenfeed 27-0-0 (Greenfeed).  The paragraph stated:

> "The Greenfeed label that Caltec gave to Mr. Chowdhury provided that it
> should be diluted with water and blended with pesticides and nutrients only
> at the time of application.  Mr. Chowdhury confirmed that blending with
> pesticides confirmed that Greenfeed was an adjuvant.  Also the Caltec web
> site claimed that Greenfeed would 'increase blossom set' and,
> consequently, was a plant growth regulator.  (DPR Exh. 1 at 14, 17, 43-
> 57.)"

The legal framework section of the Decision included the statutory definition of

"spray adjuvant" (§ 12758) and the regulatory definition of "intended to be used"

(Regulation 6145).  The Decision stated the phrase "intended to be used" applied "to

situations where the product 'contains one or more active ingredients and has no

significant commercially valuable use' other than as a pesticide."  Based on invoices for

133 sales of Greenfeed, the Department fined Caltec a total of $133,000.

Part E of the analysis section of the Decision addressed whether Greenfeed was a

pesticide.  The Decision stated the designations as a fertilizer and a pesticide were not

mutually exclusive and "Greenfeed could be both."  It also stated:  "And, regardless of

whether it is a fertilizer, as a spray adjuvant, it is definitely a pesticide."  The discussion

supporting the conclusion that Greenfeed was a spray adjuvant stated:

> "The [133 Caltec] invoices do not describe Greenfeed as a 'spray adjuvant'
> for pesticides.  Most of the invoices involve the sale of Greenfeed only with
> '27/75-0-0' as the description.  Five of the invoices also included sales of
> pesticides.  (DPR Exh. 7 at 557-561.)  None included the sale of other
> nutrients.

---

[*]    See footnote, *ante,* page 1.

21.

"As outlined above, to support its assertion that Greenfeed is a 'spray adjuvant,' DPR provides statements f[ro]m the Caltec Web site and from the Greenfeed label that it should be diluted and combined with pesticides. (DPR Exh. 1 at 17.) Caltec stated that Greenfeed is 'Compatible with pesticides other than sulfur [and has] excellent sticking and spreading qualities [and can be used] as a carrier for most pesticides.' DPR witness Saiful Chowd[hu]ry, obtained these labels from Caltec on May 30, 2013. Mr. Chowd[hu]ry's expert testimony at the administrative hearing was relevant and reliable."

Part E of the Decision's analysis section also addresses a factual dispute about whether copies of Greenfeed's label were provided to the general public or Caltec's distributor clients. The decision states Chowdhury was provided a copy of Greenfeed's label on May 30, 2013, and then states: "Furthermore, even if Caltec did not provide copies of the label [to the public or its distributors], Caltec does not deny that Greenfeed was sold as a spray adjuvant; that is its primary purpose."

### 2. *Greenfeed's Certification and Label*

The March 2015 declaration of Caltec's president and owner is part of the administrative record. The declaration states "Caltec has held a Certificate of Registration for Fertilizing Materials" for Greenfeed from the DeptAg since approximately 1995. Attached to the declaration was a copy of the DeptAg's certificate, which listed Greenfeed under the heading "Commercial Fertilizer."

The label for Greenfeed included in the administrative record states "A FOLIAR SLOW RELEASE NITROGEN" with a guaranteed analysis of 27 percent total nitrogen. Urea nitrogen constitutes 7.56 percent of Greenfeed, and slowly available water soluble nitrogen from polymethylene urea, monomethylol urea, and methylene diurea constitutes 19.44 percent of Greenfeed. These two percentages, when added together, equal the total nitrogen of 27 percent referred to on the label.

The Decision refers to blending instructions set forth in Greenfeed's label. The instructions state: "Dilute with water and blend with other nutrients and pesticides only

22.

at the time of application and in the amounts required." The instructions also direct the user to "See Caltec Application Guide."

### 3. Caltec's Greenfeed Documents

The administrative record contains documents related to Greenfeed and printed on May 30, 2013, from a Web site maintained by Caltec. One document describes the foliar benefits of Greenfeed. Other documents are application guides, including a general application guide for all crops and other guides for specific crops or plants, such as almonds, cotton, grass seed, lawn care, pears, potatoes, tomatoes and young trees.

The document describing the foliar benefits of Greenfeed consists of 14 bullet points. The Department highlighted the following three bullet points to support its contention Greenfeed was a spray adjuvant: "COMPATIBLE WITH PESTICIDES OTHER THAN _SULFUR_"; "EXCELLENT STICKING AND SPREADING QUALITIES"; and "USE AS CARRIER FOR MOST PESTICIDES."

Other bullet points address Greenfeed's use as a fertilizer. For instance, the first two bullet points state: "SLOW RELEASE IN PLANT PROVIDES SIGNIFICANTLY IMPROVED NITROGEN BALANCE OVER EXTENDED PERIOD OF TIME" and "NO 'QUICK' FLUSH OF GROWTH, GRADUAL GREENING." Other points state Greenfeed is economical when the efficiencies of foliar versus soil fertilizer are considered and it can be used undiluted on some crops.

The application guide for tomatoes includes the following statement: "GREENFEED, a liquid controlled release urea based nutrient, when applied at bloom, triggers flower initiation and set. This is a result of the addition of $NH_{3-}$ $NH_{4+}$ to the plant which activate polyamines and triggers floral fluorescence in the plant. [¶] The second application maintains the nitrogen level necessary to sustain set and helps to produce a canopy which reduces sunburn and/or heat stress." Another application guide states: "Foliar application of GREENFEED foliarly provides a 4 to 6 (and sometimes more) to 1

23.

efficiency factor, compared to soil applied nitrogen. [¶] Foliar Nitrogen can be applied for efficient results WHEN and WHERE the plant needs it as opposed to soil applications of Nitrogen which require days to covert in the soil to a usable form." An almond recommendation guide states that "during the bloom period, a mature almond tree will require 2-3 pounds of nitrogen per acre per day. Greenfeed can safely supply this Nitrogen in the form of $NH_{4+}$ at a very low cost per acre."

A Caltec product guide for 2008 includes "Greenfeed 27/75-0-0" at the top of a list of proprietary slow release nitrogen products. This product guide was obtained by Chowdhury from the Caltec Agri Marketing Services Web site located at <www.caltecag.com>.

  B.  <u>Greenfeed as a Commercial Fertilizer</u>

    *1.  Statutory Definitions and Regulations*

"Commercial fertilizer" is defined by section 14522 as "any substance which contains 5 percent or more of nitrogen (N), available phosphoric acid ($P_2O_5$), or soluble potash ($K_2O$), singly or collectively, which is distributed in this state for promoting or stimulating plant growth." Nitrogen, available phosphoric acid, and soluble potash are designated by section 14556 as the three "[p]rimary plant nutrient[s]." The term "[l]abel" encompasses the written, printed or graphic material on the container and "a statement, including *guaranteed analysis*, accompanying fertilizing material." (§ 14540, italics added.) "'Guaranteed analysis' means the minimum percentage of primary or secondary plant nutrients or micronutrients, or both, claimed." (§ 14536.)

The foregoing statutory definitions help explain the regulation addressing the use of numerals to describe a fertilizer's "guaranteed analysis." Section 2301 of title 3 of the California Code of Regulations states:

> "When any series of numerals are used in labeling of or in advertising to describe the formula or analysis, or in connection with the name, brand, or trademark, such numerals shall be arranged so that the first will be the

guaranteed percentage of nitrogen; the second, the guaranteed percentage of available phosphoric acid; and the third, the guaranteed percentage of soluble potash. The guaranteed percentages shall be consistent with the guaranteed analysis."

In accordance with this regulation, the "27-0-0" appearing in Greenfeed's label informs the reader that the guaranteed percentage of nitrogen is 27 and there are no guaranteed percentages of available phosphoric acid or soluble potash.

The label's reference to slow release nitrogen also is subject to a regulation. A "label shall not refer to slow release of" nitrogen unless 15 percent or more of the total of the guarantee for nitrogen qualifies as slowly released. (Cal. Code Regs., tit. 3, § 2311, subd. (c).) Types of slow release nitrogen include (1) certain water insoluble products such as urea formaldehyde and isobutylidene; (2) encapsulated soluble fertilizers; and (3) products containing water soluble nitrogen such as ureaform materials, methylene diurea and dimethylene triurea. (Cal. Code Regs., tit. 3, § 2311, subd. (b).)

### 2. Greenfeed is a Commercial Fertilizer

The Decision did not expressly find Greenfeed was or was not a commercial fertilizer. An implied finding that Greenfeed was not a commercial fertilizer cannot be recognized by this court because there is no substantial evidence in the record to support such an implied finding. (See *Madera Oversight Coalition, Inc. v. County of Madera* (2011) 199 Cal.App.4th 48, 66 [implied findings of fact must be supported by substantial evidence].) Based on the undisputed documentary evidence, we conclude that Greenfeed qualifies as a commercial fertilizer as that term is defined in section 14522.

Greenfeed's status as a commercial fertilizer does not automatically resolve the question of whether it is a pesticide. The Decision correctly states that the concepts of fertilizer and pesticide are not mutually exclusive. As explained below, Greenfeed's use as a commercial fertilizer is relevant to one of the elements incorporated into the definition of spray adjuvant.

25.

C.  Greenfeed is a Spray Adjuvant

       1.  *Sufficiency of the Evidence*

The Decision states Greenfeed is a pesticide because it is a "spray adjuvant."[11] This determination appears to be based on two specific findings.  First, the Decision states the Greenfeed label and Caltec documents provide "that it should be diluted and combined with pesticides."  The Department's trial brief and appellate brief rely on this finding to support the determination that Greenfeed was a spray adjuvant.  Second, the Decision states that being a spray adjuvant is Greenfeed's "primary purpose."  The Department's trial brief and appellate brief do not rely on this finding.

The finding that Greenfeed's primary purpose is as a spray adjuvant is not supported by substantial evidence. Greenfeed's label, the various application guides produced by Caltec, and the certification by the DeptAg demonstrate that the main reason for using Greenfeed is to provide nitrogen—a primary plant nutrient—to the plants to which it is applied.  The references to Greenfeed being compatible with pesticides other than sulfur and "compatible with a wide range of pesticides, micro and macro nutrients" shows that Greenfeed is capable of being mixed with some pesticides and other nutrients and applied together, which saves the additional time and cost of separate sprayings.  Simple compatibility does not establish that Greenfeed's primary purpose is as a spray adjuvant—that is, as an agent "intended to be used with another pesticide as an aid to the application or effect of the other pesticide." (§ 12758.)  Accordingly, the finding as to Greenfeed's primary purpose is not supported by substantial evidence.

Similarly, the finding that Greenfeed "should be … combined with pesticides" is not supported by the evidence.  The word "should" is "used in auxiliary function to

---

[11]  The Decision did not explicitly work through the elements of the definition of spray adjuvant and explain how Greenfeed satisfied those elements.  (See § 12758 [definition of spray adjuvant].)  For instance, the Decision did not state how the phrase "intended to be used" was satisfied.  (*Ibid.*)

express obligation, propriety, or expediency <'tis commanded I ~ do so – Shak.> <this is as it ~ be – H. L. Savage> <you ~ brush your teeth after every meal>." (Merriam-Webster's Collegiate Dict. (10th ed. 1999) p. 1085.) Here, the documentary evidence shows Greenfeed is capable of being combined with some pesticides. It does not support the finding that Greenfeed *should* be combined with pesticides.

There is no recommendation that Greenfeed should be combined with a particular pesticide or category of pesticides. There is no explanation of how a combination of Greenfeed and a pesticide improves the benefits obtained from Greenfeed or from the pesticide. Furthermore, Caltec's documents describing many applications of Greenfeed to various crops and plants relate to its use alone and inform the user to seek additional information if the user wished to mix Greenfeed with other products.

For example, Caltec's grass seed application guide states Greenfeed "[c]an be applied in multiple applications with Tilt and/or other fungicides." The application guide also states "[f]ollow fungicide label when applied together" and informs the user that "[a] buffer may be required when applied in combination with other products" because Greenfeed has a pH of 9.1. Thus, the application guide does not state Greenfeed *should* be used with fungicides, but simply states it is possible and provides advice for how to proceed if that option is chosen.

Caltec's all-crop application guide for Greenfeed provides information about the volume of water to use if Greenfeed is applied by a boom sprayer, by air or in a low volume spray. The next paragraph states:

> "If combined with Crop Protection Chemicals (CPC), maintain proper manufacturer recommended dilutions. Always jar test CPC combinations for compatibility before tank mixing, and perform small trial applications and observe for any combination injury. As GREENFEED$^{TM}$ has a high alkaline pH (9.1), a buffering agent should be used when mixing with those CPC's that are sensitive to high pH solutions."

27.

As with other Caltec documents, this guide shows that under certain conditions it is possible to mix Greenfeed with pesticides, but it does not reasonably support the inference that Greenfeed *should* be used with pesticides—that is, it would be improper to use Greenfeed alone.

In summary, the two express findings of fact relating to Greenfeed's primary purpose and use in combination with pesticides are not supported by substantial evidence. In addition, the finding that Greenfeed should be diluted is not completely accurate. Caltec's document describing the foliar benefits of Greenfeed states "CAN BE USED UNDILUTED ON SOME CROPS" as one of its 14 bullet points. Thus, an accurate finding would state that Greenfeed usually is diluted before application.

### 2. *Application of Definition of Spray Adjuvant*

The statutory elements of a "spray adjuvant" are (1) an agent, (2) intended for use with another pesticide, (3) "as an aid to the application or effect of the other pesticide," (4) which is sold in a separate package. (§ 12758.)

The first statutory element requires the substance to be "any wetting agent, spreading agent, deposit builder, adhesive, emulsifying agent, deflocculating agent, water modifier, or similar agent." (§ 12758.) Caltec's document describing the foliar benefits of Greenfeed contains bullet points stating: "COMPATIBLE WITH PESTICIDES OTHER THAN *SULFUR*"; "EXCELLENT STICKING AND SPREADING QUALITIES"; and "USE AS CARRIER FOR MOST PESTICIDES." The references to Greenfeed's spreading qualities and its use as a carrier for most pesticides adequately support the finding that Greenfeed is a "spreading agent" for purposes of section 12758.

The second element of the definition of spray adjuvant addresses whether the substance was "intended to be used with another pesticide." (§ 12758.) Regulation 6145 defines "intended to be used" in various ways. The definition is satisfied when, among other things, a person selling the substance states or implies (by labelling or otherwise)

28.

that "the substance, either by itself or in combination with any other substance, *can* or should *be used as a pesticide*." (Regulation 6145, subd. (a)(1), italics added.) Here, the bullet points in Caltec's document clearly implies that Greenfeed could be used as a spray adjuvant (a type of pesticide) by stating Greenfeed is compatible with pesticides other than sulfur and can be used as a carrier for most pesticides. Therefore, we conclude the bullet points constitute substantial evidence supporting a finding that Greenfeed was "intended to be used with another pesticide." (§ 12758.)

The third element addresses whether Greenfeed's use with another pesticide is intended "as an aid to the application or effect of the other pesticide." (§ 12758.) The reference in the bullet points to Greenfeed's sticking and spreading qualities adequately supports a finding that Greenfeed was intended to aid the application of a herbicide, fungicide or insecticide by helping that pesticide spread on, and stick to, the foliage of the plants to which it is applied.[12]

As to the fourth element, the invoices and labels contained in the administrative record demonstrate Greenfeed was sold in separate packaging. Caltec does not argue otherwise. Consequently, we conclude that there is sufficient evidence to support the finding that Greenfeed is a spreading agent, sold in separate packaging, and intended to be used as an aid to the application of other pesticides. Thus, Greenfeed satisfies the statutory elements of a spray adjuvant. (§ 12758.) Accordingly, the Department's determination that Greenfeed is a pesticide must be affirmed.

---

[12] For purposes of making a complete record, we conclude Greenfeed does not met the ingredient-based definition of "intended to be used" contained in subdivision (c) of Regulation 6145 because Greenfeed has a significant commercially valuable use as a fertilizer that provides plants with nitrogen, one of the three primary plant nutrients. Also, a bullet point in the document describing Greenfeed's foliar benefits states it can be used undiluted on some crops. This undiluted use shows that Greenfeed does not need to be used with other products such as pesticides to have commercial value, a fact which is confirmed by Greenfeed's registration by the DeptAg as a commercial fertilizer.

29.

IV.    TERRA TREAT

   A.    Background

      1.    *Administrative Decision*

Part F of the analysis section of the Decision states there is ample evidence to support the Department's assertion "that Terra Treat is a spray adjuvant that Caltec claimed could be used to disburse other pesticides into the soil."  The evidence includes a label that described Terra Treat as a soil surfactant/penetrant designed to uniformly distribute fertilizer, *pesticides* and/or water throughout the root zone.  Based on invoices for seven sales of Terra Treat, the Department fined Caltec a total of $7,000—that is, $1,000 for each sale of the unregistered pesticide.

      2.    *Terra Treat's Certification*

The March 2015 declaration of Caltec's president and owner states Caltec held a certificate of registration for fertilizing materials from the DeptAg that listed Terra Treat as an "Auxiliary Soil and Plant Substance."  A copy of the certificate of registration is attached to the declaration.  The declaration states Caltec has held a certificate of registration for Terra Treat since approximately 1995.

   B.    Statutory Construction

      1.    *Contentions of the Parties*

Caltec contends that because Terra Treat is registered with the DeptAg as an "auxiliary soil and plant substance" and the statutory definition of "auxiliary soil and plant substance" excludes pesticides (§ 14513), it follows that Terra Treat is not a pesticide.  Caltec argues California's two statutory schemes relating to fertilizing materials and pesticides must be read together and the term "pesticide" given the same meaning in each scheme.  In Caltec's view, the statutory language evinces an intent to avoid the duplicative regulation of auxiliary soil and plant substances as pesticides, and vice versa.  This argument suggests that Caltec regards the DeptAg's registration of Terra

30.

Treat as an auxiliary soil and plant substance is a final administrative determination that Terra Treat is not a pesticide under section 12753.

The Department argues the term "pesticide" used in the exception to the statutory definition of auxiliary soil and plant substance does not have the same meaning as the term "pesticide" defined in section 12753. In the Department's view, which was adopted in the Decision, section 14513's exclusion used the term "pesticide" in its ordinary sense, rather than in the technical sense set forth in section 12753. Under this statutory interpretation, it is possible for a product to be a pesticide under the technical elements of section 12753 and also be an auxiliary soil and plant substance under the statutory scheme governing fertilizing materials.

### 2. Statutory Text

Chapter 5 of division 7 of the Food and Agricultural Code governs fertilizing materials and contains provisions for licensing sellers, registering products, labeling, inspections, and procedures for prosecuting violations. (§§ 14501–14682.) In contrast, chapter 2 of the same division governs pesticides. (§§ 12751–13192.)

"Fertilizing materials" is defined as "any commercial fertilizer, agricultural mineral, auxiliary soil and plant substance, organic input material, or packaged soil amendment." (§ 14533.) Each component of this definition, in turn, is defined by statute. (§§ 14522 [commercial fertilizer], 14512 [agricultural mineral], 14513 [auxiliary soil and plant substance], 14550.5 [organic input material], 14552 [packaged soil amendment].) "Auxiliary soil and plant substance" includes, without limitation, (1) substances applied to soil for corrective purposes; (2) substances intended to improve desirable characteristics in plants, such as germination, growth or yield; and (3) substances intended to produce chemical, biological or physical change in soil. (§ 14513.) The statute also provides that the term "auxiliary soil and plant substance" "does not include commercial fertilizers, agricultural minerals, *pesticides*, soil

31.

amendments except biochar, or manures." (§ 14513, italics added; see § 14545 [manure].) In comparison, the statutory definitions of "pesticide" and "spray adjuvant" do not contain an exclusion for "auxiliary soil and plant substance." (See §§ 12753, 12758.) The parties dispute how these statutory definitions fit together.

### 3. Meaning of the Word "Pesticide"

For purposes of this opinion, we assume without deciding that Caltec has properly interpreted the statutory scheme and the term "pesticide" appearing in section 14513's exclusion has the same meaning as the term "pesticide" defined by section 12753. Under this assumption, if a material qualifies as a "pesticide" subject to regulation under chapter 5 of division 7 of the Food and Agricultural Code, it is not an "auxiliary soil and plant substance" subject to regulation under the chapter governing fertilizing materials because of the exclusion in section 14513.

### 4. Impact of Terra Treat's Registration

The next legal question presented is whether the DeptAg's registration of Terra Treat as an "auxiliary soil and plant substance" means Terra Treat is not a "pesticide" subject to regulation by the Department under chapter 2 of division 7 of the Food and Agricultural Code. Based on the circumstances of this case, we conclude the registration does not prevent Terra Treat from being a pesticide subject to regulation by the Department.

The definition "auxiliary soil and plant substance" excludes "pesticides." (§ 14513.) In comparison, the definition of "pesticides" set forth in section 12753 does not exclude "auxiliary soil and plant substance" or the broader term "fertilizing materials." When these provisions are read together, the classification of a material as a "pesticide" precludes it from also being classified as an "auxiliary soil and plant substance."

Here, the sequence of the determinations was different. Terra Treat was registered as an "auxiliary soil and plant substance" *before* the Department determined it was a "pesticide." As a result, the narrow question presented is whether the DeptAg's registration of Terra Treat as an "auxiliary soil and plant substance" precludes the Department from *subsequently* determining Terra Treat was a "spray adjuvant" under section 12758 and, thus, a "pesticide" under section 12753.

Caltec's argument is the equivalent of claiming that the DeptAg's registration is a binding determination that Terra Treat is not a "pesticide." The parties have not analyzed the issue from this perspective. For instance, they have not set forth any rules of law that identify when a determination by one administrative agency is binding upon another administrative agency. One set of legal rules addressing this topic is the doctrine of collateral estoppel, as modified for administrative decisions.

"For an administrative decision to have collateral estoppel effect, it and its prior proceedings must possess a judicial character. [Citation.] Indicia of proceedings undertaken in a judicial capacity include a hearing before an impartial decision maker; testimony given under oath or affirmation; a party's ability to subpoena, call, examine, and cross-examine witnesses, to introduce documentary evidence, and to make oral and written argument; the taking of a record of the proceeding; and a written statement of reasons for the decision." (*Pacific Lumber Co. v. State Water Resources Control Bd.* (2006) 37 Cal.4th 921, 944.) Here, the DeptAg's registration of Terra Treat did not possess a judicial character and, therefore, the registration has no collateral estoppel effect on the Department.

In the absence of any other legal doctrine supporting the conclusion that the Department is bound by the DeptAg's registration, we conclude the registration of Terra Treat as an "auxiliary soil and plant substance" did not preclude the Department from determining Terra Treat was also a pesticide subject to regulation under chapter 2 of division 7 of the Food and Agricultural Code. Therefore, the Department did not act in

33.

excess of its jurisdiction for purposes of subdivision (b) of Code of Civil Procedure section 1094.5.

### C. Sufficiency of the Evidence

Caltec also contends the evidence is insufficient to support the Department's finding that Terra Treat was a spray adjuvant. We disagree.

*1. Documents in Administrative Record*

Caltec asserts that "Terra Treat is a soil wetting agent that is intended to be applied to soil to improve water penetration." One of the documents cited by Caltec to support this assertion states that "managers often experience problems getting irrigation water to effectively and efficiently penetrate soil" (boldface and italics omitted) and explains that the surface tension of water may prevent it from physically penetrating the soil surface and root zone. The document then states:

> "The surfactants in Terra Treat Soil Penetrant are specifically designed to improve the spreading and penetration of water applied through irrigation systems. Injecting Terra Treat into irrigation system reduces the surface tension of water, which facilities penetration of irrigation water.

> "Terra Treat surfactant molecules in the irrigation water also attach to the water repellent 'coating' on thatch material and on the soil surface. This increases the adhesion between applied water and these surfaces.…

> "The net effect of reduced surface tension and increased adhesion of applied water at the water thatch and water soil interface will enhance spreading and penetration into the soil and root profile.

> "The improved pattern of penetration, spreading, and hydration allows water to move more quickly and more efficiently into the soil. Reduction of water loss due to efficiently into the soil. Reduction of water loss due to surface evaporation and run-off can be expected."

The second page of the document asks, "EVER WONDER WHERE YOUR WATER AND PESTICIDES WENT?" That page states Terra Treat distributes water laterally and uniformly beneath the soil surface 8 to 12 inches deep. It also states Terra

Treat can be applied through drip, flood, furrow, micros, or sprinklers and added with soil pesticides.

The label for Terra Treat appears in the administrative record at pages 1387 to 1388 and 1509. Each version of the label states: "A SOIL SURFACTANT/PENETRANT DESIGNED TO UNIFORMLY DISTRIBUTE FERTILIZER, PESTICIDES, AND/OR WATER THROUGHOUT THE ROOT ZONE."

A technical information sheet dated May 2011 for Terra Treat states: "SIGNIFICANTLY INCREASES THE EFFECTIVENESS OF SOIL-INJECTED, BAND-APPLIED LIQUID FERTILIZERS, INSECTICIDES, FUMIGANTS AND HERBICIDES." The technical information sheet includes the following entry: "**Chemistry**: Non-ionic, polyol soil wetting agent."[13]

### 2. *Application of Statutory Definition of "Spray Adjuvant"*

The statutory elements of a "spray adjuvant" are (1) any wetting or similar agent, (2) intended for use with another pesticide, (3) "as an aid to the application or effect of the other pesticide," (4) which is sold in a separate package. (§ 12758.)

Terra Treat easily satisfies the first and fourth elements. Caltec's opening brief states "Terra Treat is a soil wetting agent" and the phrase "soil wetting agent" appears in the technical information sheet dated May 2011. As to packaging, the labels in the record demonstrate Terra Treat is sold in separate containers or packaging rather than being premixed by Caltec with other substances, such as fertilizers or other pesticides.

As to the second and third elements, Caltec contends "there is nothing in the record demonstrating that Terra Treat is intended to be used with other pesticides *to improve the efficacy of the other pesticide*." One shortcoming of this argument is that it

---

**13**      Thus, the documents describing Terra Treat are distinguishable from the documents describing Greenfeed in that Terra Treat is explicitly referred to as a wetting agent and no document describes Greenfeed as an "agent" of any sort.

overlooks part of the statutory definition.[14] The definition is not limited to agents that aid the effect (i.e., improve the efficacy) of another pesticide. It also covers agents that are "an aid to the *application* … of the other pesticide." (§ 12758, italics added.) Terra Treat's label states it is capable of uniformly distributing pesticides throughout the root zone. This statement about uniform distribution is sufficient to support the factual finding that Terra Treat is an aid to the application of pesticides. Accordingly, the third element has sufficient evidentiary support.

As to whether Terra Treat is intended for use with another pesticide, the regulatory definition of "intended to be used" is satisfied when the seller of a substance claims or states, by labeling or otherwise, that the substance, by itself or in combination with any other substance, can be used as a pesticide. (Regulation 6145, subd. (a)(1).) A claim that a substance can "be used as a pesticide" necessarily includes the more specific claim that the substance can be used as a spray adjuvant because the statutory definition of "pesticide" includes "spray adjuvant." (§ 12753.) Here, Caltec has claimed that Terra Treat can be used as a spray adjuvant by stating it was designed to uniformly distribute pesticides throughout the root zone.

Consequently, we conclude that there is sufficient evidence to support the finding that Terra Treat is a wetting agent, sold in separate packaging, and intended to be used as an aid to the application of other pesticides. Accordingly, the Department's findings and conclusions as to Terra Treat, along with the fine of $7,000, shall be upheld.

---

**14** A second shortcoming is Caltec's failure to address the Terra Treat technical information sheet dated May 2011 and its statement that Terra Treat significantly increases the *effectiveness* of soil-injected, band-applied insecticides, fumigants and herbicides. This statement is the equivalent of saying Terra Treat is "an aid to the … effect of [a] pesticide." (§ 12758.)

V.    KELPAK

    A.    Background

        *1.    Violations Alleged*

The Notice of Proposed Action alleged Kelpak, as a plant growth regulator, is a pesticide product.  It also alleged (1) Caltec had sold Kelpak in California a total of 282 times from June 1, 2010, through June 30, 2014; (2) the sales totaled $4,165,862.50; (3) during that period, Kelpak was not registered as a pesticide in California; and (4) the sales of the unregistered Kelpak violated section 12993.  The Notice of Proposed Action stated the Department sought a penalty of $2,000 per sale, which totaled $564,000.

        *2.    The Decision*

The Decision states that (1) pesticides include plant growth regulators, (2) auxins and cytokinins are plant growth regulators, and (3) Kelpak is a liquid auxin concentrate and, therefore, a plant growth regulator.  The Decision acknowledged Caltec's factual assertions that Kelpak is derived solely from edible seaweed, does not include added plant hormones, and is registered as an organic input material with the DeptAg.  The Decision stated:  "Auxins in seaweed are plant hormones which in un-concentrated form is possibly a fertilizer.  But in concentrated form seaweed auxins are probably plant growth regulators or pesticides, not fertilizers."[15]

The Director imposed the penalty recommended in the Notice of Proposed Action.  Thus, Caltec was fined $2,000 for each of the 282 sales of Kelpak that violated section 12993, or a total of $564,000.

---

[15]    A parenthetical citation immediately after this statement directs the reader to see the discussion in *G & M Farms, Inc. v. Britz-Simplot Grower Solutions, LLC* (E.D.Cal. May 28, 2013, No. 1:13-CV-0368 LJO MJS) 2013 U.S. Dist. LEXIS 75458 (*G & M Farms*).

B.    Evidence Presented

    1.    *Documents*

Caltec's invoices for its sales of Kelpak include a box labeled "Description."  The entries in this box describe Kelpak as a "Liquid Auxin Concentrate."  Kelpak's label describes it as a "Liquid Seaweed Concentrate" and an "Organic Plant Nutrient."  The label includes a logo stating it is a material registered with the Washington State Department of Agriculture for use in organic agriculture.  The label also directs users to refer to the Kelpak Application Guide for specific crop recommendations.

A "Kelpak Guide Manual" included in the administrative record contains sections for (1) product specifications and (2) mode of action and responses.  The product specifications state the active ingredients are "Natural Auxins 11 mg / litre" and "Natural Cytokinins 0.031 mg / litre."  The first two paragraphs of the section labeled "MODE OF ACTION AND RESPONSES" state:

> "Kelpak is a plant bioregulator made from the seaweed species *Ecklonia maxima* (commonly known as kelp), and found in the cold waters of[f] the South African West Coast.  This species has a prolific growth rate, due mainly to the presence of the plant hormone groups auxins and cytokinins.  The cell sap containing these hormones is extracted from freshly-harvested kelp with the unique cell burst technology, patented worldwide.  No heat, freezing or harsh chemicals are used to break the cell walls in the extraction process.  This ensures that the delicate compounds found in the kelp are maintained in their active form in Kelpak.  The natural high auxin to low cytokinin ratio in the fresh kelp is therefore maintained in the end product.  The Institute of Marketecology (IMO), BCS Oko-Garantie, The UK Soil Association, Australian Biological Farmers and SGS have accredited this organic product for use in organic agriculture.

> "This auxin-dominated extract stimulates prolific adventitious root formation when Kelpak is applied to almost any plant.  This drastic increase in root tips leads to an increased level of cytokinins in treated plants, as this group of hormones is mainly produced in root tips.  The increased root volume and number of root tips also increases moisture and nutrient uptake from the soil.  The improved nutrient status, together with the higher level of cytokinin in the plant, gives better top growth which causes the increase in yield and quality of crops.  The improved root system

38.

also makes the plant more resistant to stresses such as drought, waterlogging, soil nutrient deficiency and salinity, nematode infestations and soil-borne diseases."

The last paragraph in this section refers to Kelpak "as a cost effective agricultural biostimulant." A June 2010 Kelpak Guide for new plantings, trees and vines, includes the line: "Use Kelpak auxin concentrate plant growth regulator as follows." This guide includes Caltec's name, address and phone numbers. Caltec's 2008 product guide lists Kelpak under the heading "Auxin Concentrate."

Exhibit D to the investigation summary prepared by Chowdhury was a September 13, 2012, press release issued by the EPA. The press release announced three enforcement actions by the EPA against Missouri pesticide distributors involving the sale of plant growth regulators, which are regulated as pesticides under FIFRA. The release stated: "FIFRA defines plant growth regulators as substances intended to accelerate or retard the growth of plants. Among other things, substances considered to be plant regulators may include hormone additives intended to stimulate plant root growth or fruiting, such as gibberellins, auxins, and cytokinins derived from seaweed. Products containing these additives are often marketed as fertilizers, but such claims do not exempt products from regulation as pesticides."

2. *Caltec's Evidence*

The March 2015 declaration of Caltec's owner states Caltec holds a certificate of registration for organic input material from the DeptAg for Kelpak liquid seaweed concentrate and includes a copy of the certificate. Also attached to the declaration is a copy of a material registration certificate from the Washington State Department of Agriculture, which states Kelpak has "been verified to comply with the USDA National Organic Standards (7 CFR Part 205)."

Caltec submitted a March 2015 declaration of Adriaan Francois Lourens, Ph.D. Dr. Lourens obtained a Ph.D. in plant physiology from the University of California, Davis and bachelor's and master's degrees from the University of Stellenbosch, South

39.

Africa.  Dr. Lourens works for Kelp Products (Pty) Ltd., the company that developed and manufactures Kelpak.  Dr. Lourens's declaration asserts Kelpak (1) is derived entirely from the edible seaweed species *Ecklonia maxima*, (2) is nontoxic, (3) includes soluble potash ($K_2O$) and lower levels of calcium and magnesium, and (4) contains no hormone additives.  The declaration also asserts "Kelpak was developed with the sole intention that it be sold and used as an organic plant nutrient."[16]

Dr. Lourens's declaration states:  "All seaweed species naturally contain varying amounts of auxins and cytokinins, plant hormones that are necessary to the normal growth of plants.  Similarly, *Ecklonia maxima* has naturally-occurring auxins and cytokinins, with the auxin levels being higher than cytokinin levels."  The declaration also states the levels of auxin and cytokinin listed on Kelpak's label—11 mg/liter and 0.03 mg/liter—were obtained from a typical bioassay for auxin-like and cytokinin-like activity and then asserts:  "These values of auxins and ctyokinins were later found to be a gross over-estimation of what were found by high technology physical analyses of the product."  The declaration does not state how the timing of these later analyses relates to the period covered by the Notice of Proposed Action.  In particular, it does not state when the analyses were completed or describe how the new information affected the labeling and marketing of Kelpak, if at all.[17]  Thus, the new information about grossly over-estimated auxin levels is not linked to what Caltec stated or implied about Kelpak in

---

**16**     We note that Dr. Lourens's declaration did not attach any of his journal articles discussing seaweed concentrate.  (See Ferreira & Lourens, *The efficacy of liquid seaweed extract on the yield of canola plants* (2002) 19(3) S. Afr. J. Plant Soil 159, 161 ["Liquid seaweed concentrate (Kelpak) … contains natural plant growth regulators that are high in auxins and low in cytokinins"; "Kelpak … appeared to be an effective and consistent growth regulator for increasing canola yield"].)  We have not relied on this or any other article authored by Dr. Lourens in deciding this appeal.

**17**     The new findings about Kelpak's (unspecified) auxin levels resulting from the high technology physical analyses did not affect Caltec's invoices from May 2014, which continued to describe Kelpak as a "Liquid Auxin Concentrate."

40.

connection with the 282 sales that are the subject to the Notice of Proposed Action. (See Regulation 6145, subd. (a).)

Caltec also submitted a March 2015 declaration of Roy Slack, the current managing director of Kelp Products (Pty) Ltd., which states he is responsible for the development of Kelpak's North America markets. Slack's declaration states that since Kelpak distribution began in the United States, neither the EPA nor any state other than California has characterized Kelpak as a pesticide. Slack's declaration also states Kelpak is registered as an organic input material with the DeptAg and, to maintain this specific type of registration, additional fees must be paid and labeling requirements satisfied.

C.     Kelpak's Registration as an Organic Input Material

It is undisputed that Kelpak is registered with the DeptAg as an organic input material. Section 14550.5 defines "organic input material" as "any bulk or packaged commercial fertilizer, agricultural mineral, auxiliary soil and plant substance, specialty fertilizer, or soil amendment, *excluding pesticides*, that is to be used in organic crop and food production and that complies with" certain national organic standards contained in the Code of Federal Regulations. (Italics added.) This definition, like the definition of "auxiliary soil and plant substance" set forth in section 14513, excludes "pesticides."

Caltec argues that Kelpak is not a plant growth regulator and, thus, is not a pesticide because the DeptAg has registered Kelpak as an organic input material. First, on the question of statutory interpretation, we conclude the Legislature intended "pesticide" to mean the same thing in section 14550.5 as it does in sections 12753 and 14513. Second, as in our analysis of Terra Treat, we conclude the DeptAg's determination that a substance is a particular type of fertilizing material with a definition that excludes pesticides is not a final and binding determination that the material is not a pesticide. Consequently, Kelpak's registration as an organic input material does not preclude the Department from determining it is a pesticide.

41.

D.     Sufficiency of the Evidence

First, Caltec argues the record does not contain sufficient evidence to support the finding that all types of cytokinins and auxins, regardless of their intended use or physical composition, are plant growth regulators and pesticides. This argument need not be discussed in detail because the Decision does not contain such a broad finding. Instead, the Decision clearly states Kelpak is a liquid that *concentrates* the auxins contained in seaweed and was intended for use as a liquid auxin *concentrate*. Thus, the Decision does not relate to all types of auxins, whether or not they are concentrated.

Second, Caltec argues substantial evidence does not support the finding that seaweed auxins in concentrated form are probably plant growth regulators and are not fertilizers. The Decision made the *general* observation that "in concentrated form seaweed auxins are probably plant growth regulators, not fertilizers." Then, the Decision addressed the specific question presented by the sales of Kelpak by stating "Caltec sold Kelpak as a Liquid Auxin Concentrate on each invoice—a plant growth regulator and not a plant nutrient."

Substantial evidence supports the explicit finding that Caltec sold Kelpak as a liquid auxin concentrate. Caltec's invoices contain that description of Kelpak. The invoices do not state Kelpak contains any primary plant nutrient, any secondary plant nutrient, or any micronutrients.[18] Thus, the description in the invoices supports the inference that Kelpak is intended to be used as an auxin concentrate, rather than intended to supply a plant nutrient not mentioned in the label or invoice.[19] In addition, Caltec's

---

[18]     Nitrogen, available phosphoric acid, and soluble potash are primary plant nutrients. (§ 14556.) The secondary plant nutrients are calcium, magnesium and sulfur, alone or in combination. (§ 14559.) "'Micronutrients' means boron, chlorine, cobalt, iron, manganese, molybdenum, sodium, or zinc, alone or in any combination." (§ 14546.)

[19]     Under section 12756, the definition of regulating plant growth does "not include the use of substances to the extent that they are intended as plant nutrients, trace elements, nutritional chemicals, plant inoculants, and soil amendments." Here, the

42.

2008 product guide lists Kelpak as an auxin concentrate. The product specifications given in a Kelpak guide manual state the active ingredients in Kelpak are natural auxins (11 mg/liter) and natural cytokinins (0.031 mg/liter). These figures are consistent with the information provided in Dr. Lourens's declaration. These documents constitute substantial evidence that Kelpak was intended to be used as an auxin concentrate.

Substantial evidence also supports the finding that, as a liquid auxin concentrate, Kelpak was sold as a plant growth regulator. The Kelpak Guide Manual includes a section labeled "MODE OF ACTION AND RESPONSES" that describes Kelpak as "a plant bioregulator made from the seaweed species *Ecklonia maxima*"; an "auxin-dominated extract"; and "a cost effective agricultural biostimulant." Moreover, Caltec's June 2010 Kelpak guide for new plantings, trees and vines, uses the phrase "Kelpak auxin concentrate plant growth regulator." Besides the explicit use of the term "plant growth regulator," the use of the terms "plant bioregulator" and "agricultural biostimulant" reasonably support the inference that Kelpak was sold as a plant growth regulator and not a plant nutrient. Furthermore, Caltec's argument that *the weight of the evidence* supports a finding that Kelpak was intended to be used as an organic input material and plant nutrient is off point, because the applicable test for reviewing the evidence is the substantial evidence standard, which does not allow a reviewing court to reweigh the evidence in the record. (See *Montebello Rose Co. v. Agricultural Labor Relations Bd.* (1981) 119 Cal.App.3d 1, 21 [power of appellate court reviewing findings of a lower tribunal begins and ends with determining whether there is substantial evidence, contradicted or not, that supports the findings].) In short, the possibility that the trier of fact could have drawn other inferences from the evidence does not establish factual error. In sum, we conclude substantial evidence supports a finding that Kelpak is a mixture of

Director was not compelled by the evidence to find that the intended use of Kelpak was as a plant nutrient. As a result, the Director's determination that the exception did not apply to Kelpak does not constitute error.

substances "intended to be used for … regulating plant growth" and, therefore, qualifies as a "pesticide" under section 12753.  (See Regulation 6145, subd. (a).)

E.    Extra-Record Evidence[*]

1.    *Contentions*

Caltec contends the hearing officer erred in relying on extra-record evidence obtained unilaterally—namely, an unreported federal district court order.  (See *G & M Farms*, *supra*, 2013 U.S. Dist. LEXIS 75458.)  Caltec contends the hearing officer relied on *G & M Farms* as evidentiary support for its factual finding that "'in concentrated form seaweed auxins are probably growth regulators or pesticides, not fertilizers.'"

In response, the Department contends (1) *G & M Farms* was not extra-record evidence, but legal authority and (2) even unpublished federal district court opinions may be referred to as persuasive authority.  (See *Haligowski v. Superior Court* (2011) 200 Cal.App.4th 983, 990, fn. 4 [unpublished federal opinion treated as convincing].)  Thus, the Department argues *G & M Farms* may be cited as persuasive authority to illuminate the hearing officer's independent determination that concentrated auxins are plant growth regulators and, therefore, pesticides.

The parties' contentions raise the question whether the hearing officer (1) relied on *G & M Farms* as evidence to support a finding of fact, (2) relied on it as authority for a legal conclusion about plant growth regulators being pesticides, or (3) relied on it in some other manner.

2.    *G & M Farms*

We begin our analysis of this question by reviewing the opinion.  In *G & M Farms*, the district court granted a motion to dismiss for lack of federal question or diversity jurisdiction.  (*G & M Farms*, *supra*, 2013 U.S. Dist. LEXIS 75458, p. 4.)  The plaintiff's causes of action alleged the application of Bloom Blend and Acadian Seaweed

---

[*]    See footnote, *ante,* page 1.

Concentrate damaged its blueberry crop. (*Ibid*.) The decision stated: "Unbeknownst to Plaintiff at the time, [Bloom Blend and Acadian Seaweed Concentrate] is not only a fertilizer but is also a plant growth regulator. It affects the physiology of plants and changes a plant's growth and production." (*Ibid*.) The court granted the motion to dismiss based on its conclusion that FIFRA does not create a private right of action. (*Id*. at p. 3.) In other words, only certain federal and state agencies may bring actions to enforce FIFRA. (*Ibid.*) As a result, the plaintiff had not stated a federal claim that could be pursued in federal court.

To place the statements in *G & M Farms* about plant growth regulators in context, we note that FIFRA defines "plant regulator" as any substance "intended, through physiological action, for accelerating or retarding the rate of growth … of plants," and excludes substances to the extent that they are intended as plant nutrients, trace elements, nutritional chemicals, plant inoculants and soil amendments. (7 U.S.C. § 136(v).) FIFRA's definition of "pesticide" includes any substance "intended for use as a plant regulator." (7 U.S.C. § 136(u)(2).) FIFRA does not explain how to distinguish between a plant regulator that accelerates growth and a plant nutrient used in synthesizing additional structures, such as leaves, stems, fruit and seeds. *G & M Farms* did not address how California's statutes should be interpreted or applied to a seaweed concentrate.

### 3. Role in the Decision's Analysis

Here, the Decision relied on *G & M Farms* to support its general observation that in concentrated form, seaweed auxins are *probably* plant growth regulators, not fertilizers. The use of the word "probably" establishes the general nature of the statement and demonstrates the hearing officer and the Director realized the statement was not controlling in this particular case. The reason the statement is not controlling is that the test for whether a substance is a plant growth regulator under California statute depends

45.

on its intended use, which may vary from case to case and product to product. (§ 12753.) The Decision recognized the importance of intent in the explicit findings that "Kelpak is a plant growth regulator *and was sold as such by Caltec*." (Italics added; see Regulation 6145, subd. (a) [seller's intent].) Therefore, considering the Decision as a whole, we interpret it as relying on *G & M Farms* to support the general observation about concentrated seaweed auxins and then basing its specific findings about Kelpak on the evidence contained in the record. Accordingly, the record before us does not establish the Department abused its discretion by referring to *G & M Farms* in the Decision as support for a general observation.

F.     Agency Web site and Publications[*]

Caltec contends the hearing officer erred in noticing and relying on the truth of statements made in unofficial agency Web sites and publications. In Caltec's view, statements made in the EPA's informal materials are not subject to judicial notice, do not constitute credible or relevant evidence, and are not administrative interpretations entitled to deference.

The Department contends the hearing officer did not commit error in admitting and considering the materials because (1) section 12999.4 does not establish any standards regarding the admissibility of evidence; (2) the provisions for an informal hearing under California's Administrative Procedures Act set forth in Government Code section 11445.40, though not mandatory, would not have compelled the exclusion of the materials; and (3) the formal hearing procedures in Government Code section 11513, though not applicable, would have allowed the admission of the materials. In addition, the Department argues that no prejudice resulted from the admission of the EPA's fact sheet on cytokinins or the EPA's question-and-answer Web page.

---

[*]     See footnote, *ante,* page 1.

Here, Caltec's appellate briefs have not identified the standard of admissibility governing the hearing officer's decisions as to the admissibility of evidence. Caltec simply refers to the Evidence Code provisions governing judicial notice as if those provisions were controlling. Government Code sections 11445.40 and 11513 demonstrate that the rules of admissibility in administrative hearings are more relaxed than the standards that apply in judicial proceedings. Despite the Department's reference to these sections and its argument that neither section applied, Caltec's reply brief failed to identify a standard of admissibility applicable the hearing officer's evidentiary decisions. To the extent that Caltec impliedly argues the technical provisions in the Evidence Code applied, we reject that argument as inconsistent with section 12999.4 and the provisions of the Administrative Procedures Act, neither of which provide the Evidence Code is applicable to the administrative proceeding. As a result of Caltec's failure to establish the applicable standard for admissibility, Caltec has failed to demonstrate that the hearing officer violated an applicable legal standard when it admitted the EPA's documents.

## DISPOSITION

The judgment is affirmed. Appellant's November 27, 2018, request for judicial notice of legislative history is granted. Respondents shall recover their costs on appeal.

_____

FRANSON, J.

I CONCUR:

_____

MEEHAN, J.

47.

POOCHIGIAN, Acting P.J., concurring,

I concur in the judgment but write separately to discuss several peculiarities of pesticide regulation in California.

I.     Regulations Significantly Limit Fact-finders' Ability to Weigh Competing Indicia of Intent

In most contexts, the intent of an actor is determined by a finder-of-fact weighing conflicting inferences from various pieces of circumstantial evidence.  As this case demonstrates, the concept of intent is also important in the realm of pesticide regulation. The statutory definition of pesticide includes any substance "intended to be used for" certain purposes (e.g., destroying or preventing pests, etc.) (Food & Agr. Code, § 12753, subd. (b).)[1]  By itself, this language would suggest a finder-of-fact can look to various factors to try to discern the intent of the seller in a particular transaction.  However, attendant administrative regulations found at 3 California Code of Regulations section 6145 (Regulation 6145) severely limit the fact-finder's prerogative.

Under Regulation 6145, a substance is "considered to be 'intended to be used' " for a pesticidal purpose if *any* of the following three circumstances apply:

> "(a)  A person who distributes or sells the substance claims, states, or implies, by labeling or otherwise, that:
>
>> "(1)    The substance, either by itself or in combination with any other substance, can or should be used as a pesticide; or
>>
>> "(2)    The substance consists of or contains an active ingredient and can be used to manufacture a pesticide; or
>
> "(b)  A person who distributes or sells the substance has actual or constructive knowledge that the substance will be used, or is intended by the user to be used, as a pesticide; or

---

[1] All further statutory references are to the Food and Agricultural Code unless otherwise stated.

"(c) The substance consists of or contains one or more active ingredients and has no significant commercially valuable use as distributed or sold other than:

> "(1)   Use as a pesticide, by itself or in combination with any other substance; or

> "(2)   Use in the manufacture of a pesticide."  (Regulation 6145.)

By using the disjunctive "or" between subdivision (a), (b), or (c), Regulation 6145 provides that if any *one* of the several factors applies, then the requisite "intent" is necessarily established.  Thus, rather than allowing the finder-of-fact to weigh various evidentiary clues of intent and arrive at an independent conclusion, this administrative regulation stacks the deck against the seller.  For example, say an organic farmer makes clear to a seller that he is purchasing an adjuvant solely to aid in application of an organic foliar fertilizer.  The farmer, a longtime client of the seller, has never used pesticides and plans never to do so.  Yet, somewhere on the adjuvant's label there is a notation that the adjuvant *could* be used to aid in application of fertilizers *or pesticides*.  In that circumstance, Regulation 6145, subdivision (a)(1) would require a finding the adjuvant was "intended to be used" as an aid to application of a pesticide even though neither the seller nor the buyer had any such intent.

In sum, the circumstances listed in Regulation 6145, subdivision (a)(1) should be subsidiary factors in discerning the ultimate issue of intent, not independently-sufficient proxies for intent.  As currently written, the regulation hinders fact-finders and makes it unduly difficult for sellers to rebut the issue of intent.  It should be reevaluated by the Department of Pesticide Regulation or addressed by the Legislature.

II.   Permitting the Classification of a Substance as a Pesticide to Turn on Statements in Marketing Materials and Websites is Questionable

One of the factors in Regulation 6145 concerns representations by the seller. (Regulation 6145, subd. (a).)  The provision provides that a seller is deemed to have intended a substance to be used as a pesticide if the seller "claims, states, or implies, by

2.

labeling or otherwise" that the substance can or should be used as a pesticide or can be used to manufacture a pesticide. (*Ibid*.) Indeed, this factor plays a central role in our holding today. Yet, the relevance of marketing materials and website descriptions in classifying a substance as a pesticide under the statute is questionable.[2] Because of their chemical properties, pesticides can pose threats to the safety of drinking water, farmworkers, farming families, and schoolchildren. (See, e.g., §§ 12980, 13141, 13182.) But a pesticide's chemical properties are not changed by the marketing materials that accompany them. It is peculiar, then, that the definition of pesticide can turn on whether marketing materials suggests it can or should be used in a particular manner.

For example, if Caltec had not indicated that Greenfeed is "compatible" with pesticides and can be a "carrier" for pesticides, then Greenfeed would arguably not be considered a pesticide. Yet, whether Greenfeed poses a threat to human health is not impacted by its marketing materials.

Or, consider a seller who incorrectly believes a substance has pesticidal effects. The substance's labeling would result in a pesticide classification, even if it has no such qualities and is entirely harmless.

Unmooring the definition of a pesticide from a substance's chemical properties would not seem to further the goal of protecting public health or the environment.

III.     It is Unclear Why Non-Toxic Adjuvants are Regulated as Pesticides

Adjuvants can be used in a variety of ways, not just pesticide application. (*Application of Lemin* (51 C.C.P.A. 942) 326 F.2d 437, 944–945.) Some adjuvants are labeled as multipurpose. Under current regulations, if just one of those purposes is to aid in the application of a pesticide, then the adjuvant itself is considered a pesticide. (See § 12758; Regulation 6145, subd. (a).) This is true even if the adjuvant has no "toxic

---

[2] Such materials are—and should remain—relevant to other issues, such as whether the seller has "misbranded" the substance. ( 12881, et seq.)

3.

properties of its own." (§ 12758.)  It is unclear what government interest is furthered by regulating nontoxic adjuvants as pesticides.  In contrast, the federal definition of pesticide in title 7 United States Code section 136(u) does not expressly include adjuvants.  The Legislature may wish to consider reexamining whether nontoxic adjuvants should be removed from the definition of pesticide, consistent with the federal statute.

With these observations, I concur in the judgment.


_____
POOCHIGIAN, Acting P.J.

4.